### UNITED STATES of America, Plaintiff,

v.

### CITY OF BIRMINGHAM, MICHIGAN, Defendant.

#### Civ. No. 80 70991.

United States District Court,
E. D. Michigan, S. D.

May 3, 1982.
Judgment May 27, 1982.

---

Brian Heffernan, Denise Field, Dept. of Justice, Washington, D. C., Ellen Christianson, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

William M. Saxton, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

DeMASCIO, District Judge.

The Department of Justice filed this suit alleging that the City of Birmingham engaged in a policy and practice that prevented Baldwin House Corporation (Baldwin House) from developing in that City racially integrated low-income senior citizen and family housing in violation of Sections 804(a) and 817 of the Civil Rights Act of 1968 (the Fair Housing Act), 42 U.S.C. §§ 3604(a) and 3617.[1] The complaint alleg-

---

1. 42 U.S.C. § 3604(a) makes it unlawful "to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable* or deny, a dwelling to any person because of race, color, religion, sex or national origin." (Emphasis added.) Any conduct or practice that prevents or limits construction of housing is

es several separate acts of the City, which interfered with Baldwin House's negotiations for the construction of low-income family housing. The government contends that this intentional interference with the Baldwin House proposal "otherwise made unavailable" housing to black families in violation of the Act. We find that the evidence fairly preponderates in support of the government's allegations. For the reasons stated, we grant judgment in favor of the plaintiff on the issue of liability.

The City of Birmingham was aware of its acute need for senior-citizen housing as early as 1969. In the Summer of 1975, the City invited interested parties to submit a proposal for the design, construction and management of a senior-citizen housing project planned by the City on the recently acquired Baldwin School site. The City officials accepted the proposal submitted by Baldwin House, a non-profit corporation formed by members of five different Birmingham churches. The Baldwin House proposal provided for construction of 156 units (later reduced to 152) of senior-citizen housing to be financed by the Michigan State Housing Development Authority (MSHDA). Baldwin House further planned to apply for tenant rent subsidies under HUD's Section 8 New Housing Program.

On December 6, 1976, Birmingham entered into an agreement for the sale to Baldwin House of the former Baldwin School site.[2] Paragraph I(G) of the agreement provided:

> The City acknowledges that federal and state policy requires that non-elderly government assisted housing as well as assisted elderly housing be provided in each housing market area. Therefore, the City agrees it will consider such existing, rehabilitated and/or *new housing* as

the Michigan State Housing Development Authority and/or U. S. of Department Housing and Urban Development shall reasonably require as a condition of providing financing and assistance to the Baldwin House project.

The agreement gave Baldwin House one year to obtain MSHDA financing. Thus, prior to signing the agreement, the City Commission knew that MSHDA would require some "family housing" as a condition for financing the construction of senior-citizen housing. City officials also knew that MSHDA would probably require some new construction of family housing.

On February 25, 1977, Baldwin House submitted its first request to MSHDA for financing the construction of family housing (50 units on one site with a possible additional 10 units on a second site). In March 1977, less than 90 days after the City signed its agreement with Baldwin House, MSHDA officials informed Mr. Watchowski, the City Grant Administrator, that, as part of its newly announced balanced housing policy, MSHDA would require one unit of low-income family housing for every two units of senior-citizen housing as a condition for financing construction of senior-citizen housing. The MSHDA made it clear that this 2-for-1 ratio merely added a numerical goal to its balanced housing policy and was negotiable. Prior to March 1977, MSHDA's balanced housing policy had never been spelled out formally in any written document. As a matter of fact, there is evidence that MSHDA had not applied its balanced housing policy uniformly throughout the state. Moreover, in March 1977, it was not clear that MSHDA would insist on *new* construction of low-income family housing as part of its balanced housing policy.

---

included within the scope of the phrase "otherwise make unavailable or deny." *Metropolitan Housing Development Corporation v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) (*Arlington Heights II*).

Section 817 of the Act, 42 U.S.C. § 3617, makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the

exercise or enjoyment of . . . any right granted or protected" by the Act.

2. The sale of the Baldwin School site required voter approval. A referendum seeking voter approval was scheduled for April 5, 1976. The proposition submitted to the voters specified that the school site would be used for senior-citizen housing. The sale was overwhelmingly approved by the voters.

This 2-for-1 ratio was discussed at an April 1977 Commission meeting. Mayor Dorothy Conrad suggested that the Commission inform the public of MSHDA's recently announced policy.[3] A public hearing was scheduled for May 12, 1977. On this date, the Commission began to actively participate in all of the negotiations between Baldwin House and MSHDA. The Commission consistently sought to avoid any requirement for new construction of low-cost family housing. On May 12, 1977, the Commission passed a resolution directing Baldwin House to explore the possibility of meeting MSHDA's balanced housing policy through the acquisition and rehabilitation of existing homes.[4] And later, at its May 31, 1977 meeting, the Commission directed Baldwin House to submit a proposal agreeing to meet MSHDA's family housing requirement by the purchase and rehabilitation of 14 existing homes. The Commission believed that these 14 homes, when added to the 25 units of approved Section 8 Existing Housing and the 11 HUD Section 312 rehabilitation loans taken out by City residents, should give the City credit for 50 units of family housing. The MSHDA replied to this proposal on June 24, 1977, and reminded Baldwin House that its 2-for-1 policy required 75 (not 50) units of family housing. The MSHDA further stated that it would credit Baldwin House with the 25 units of Section 8 housing, but refused to credit the City's participation in the Section 312 program. However, MSHDA did promise to consider a program of substantial rehabilitation as one method of meeting its balanced housing requirement.

Thus, it is clear that the City did interfere with Baldwin House's negotiations with MSHDA and it is equally clear that the City continued to dictate the terms of proposals Baldwin House could submit to MSHDA after May 31, 1977.[5] On July 18, 1977, the Commission directed Baldwin House to submit a proposal agreeing to supply "50 single-family, scattered site rental units" to meet MSHDA's balanced housing requirement. The MSHDA responded with a promise to review this proposal provided Baldwin House and the City would be willing to construct 25 new family housing units. On August 15, 1977 Baldwin House submitted a proposal for "50 single-family, scattered site rental units," and acknowledged that the program might require some new construction and that "25 might be a goal" for new construction.

On September 1, 1977, MSHDA informed Baldwin House that it had accepted Baldwin House's proposal for processing, and requested additional information. Generally, the acceptance of a proposal for processing reflects MSHDA's belief that the proposal has a reasonable chance of completion. On September 14, 1977, Baldwin House provided MSHDA with the information it requested, including a copy of an unexecuted purchase agreement for a multiple-unit family housing site on Lincoln Street. Baldwin House also submitted a revised development proposal designed to meet the balanced housing requirement. It was apparent to all that MSHDA was seriously considering the Baldwin House proposal. On October 25, 1977, a MSHDA Development Fund Loan Report recommended approval of an $83,000 development loan for Baldwin House to cover initial expenses, including the right to acquire options for family-housing sites. Approval of such a

---

3. Prior to April 1977, the City Commission did not publicize any of Baldwin House's proposals to meet MSHDA's balanced housing requirement.

4. To assist Baldwin House in putting this proposal together, Mr. Watchowski provided Baldwin House with an inventory, prepared by the City, of Birmingham houses in need of rehabilitation. In August 1977, Baldwin House engaged Winona Stout, a real estate broker, to inspect City housing. She discovered 20 to 30 houses worth less than $35,000 in need of reha-

bilitation. A majority of that number was for sale.

5. Baldwin House, a group of private citizens, did not need extensive assistance from the City to construct either senior citizen or family housing. Baldwin House only required the City to sell it the Baldwin School site and to grant a tax abatement for the site. The tax abatement was a minor concession. The school site had not been on the tax rolls for many years. Baldwin House had agreed to make an annual payment to the City in lieu of taxes.

loan assures an applicant that the MSHDA Board has a "reasonable anticipation" that a mortgage loan commitment will materialize. The October 1977 report contains several proposals for meeting MSHDA's family-housing requirement, including a proposal that the City favored: the rehabilitation of 50 existing homes. The final decision on the number of new and rehabilitated units would have been made prior to or at the final closing on the mortgage.

Soon after the public had been advised that Baldwin House intended to construct low-income family housing, opposition began to surface. Much of the opposition to the proposal centered on fears that family housing might introduce "harmful elements" into Birmingham. At its May 31, 1977 meeting, the Commission considered a suggestion to earmark 80% of the senior-citizen units for Birmingham residents. Commissioner Robert Kelly, the only Commissioner openly opposed to Baldwin House, stated in opposition to the 80% suggestion, "The dilution factor in the Tri-County area is 15% minority groups, you want to do more than the average dilution factor; I couldn't support that." At a Commission meeting in July 1977, Commissioner Kelly said:

> The record will show that these people in coming out here—the history of HUD and these people is to destroy. Any place they have been involved before, go to Detroit, go to any of the cities and see what they have done. In my opinion, they have destroyed. Why don't they take the money back there and build rather than move into another area and take 75 units, houses, private homes off the market and was not presented to the people of this community.

We find that when he spoke of "these people" Commissioner Kelly was referring to black people. We further find that Mr. Kelly was equating non-Birmingham residents with minorities and that his objection to the 80% suggestion was based on his opposition to increasing the number of black people living in Birmingham.

On October 31, 1977, the City Commission discussed the renewal of the Baldwin House contract and tentatively agreed to a nine-month extension. One week later, November 7, 1977, a group of 75 to 100 Birmingham residents led by Nancy Elby attended the Commission meeting. Part of the group became hostile and repeatedly interrupted Commissioners who tried to speak. They expressed their strong opposition to the construction of any family housing in Birmingham. They stated their concern about "those people" coming to Birmingham. They contended that construction of family housing would harm the City's neighborhoods and reduce property values. We find that when the group led by Nancy Elby referred to "those people," they were referring to black people. There is no doubt that the Commissioners present at the November 7 meeting knew that the opposition to construction of family housing was based in part on race.

Residents who opposed the Baldwin House proposal attended every Commission meeting between November 1977 and April 1978. At the November 28, 1977 Commission meeting, Nancy Elby presented a petition, signed by a number of Birmingham residents. The group insisted that plans to build family housing be discarded and that the City conduct an advisory referendum on the Baldwin House proposal. The group also insisted that the Commission defer further consideration of the tentative agreement to extend the Baldwin House contract until after the referendum. The group stated several reasons for its opposition. The most often-mentioned reason was the fear that construction of low-income housing might lower property values. Others voiced resentment over the intrusion into local affairs by state and federal governments. At trial, although she declined to speculate on their motivation, Commissioner Ann Dropiewski did believe that some of the concerns expressed "could well be interpreted by many to include that of racial discrimination." She testified that after the meeting, she asked Nancy Elby to be "careful" with the issue of low-income housing because she believed others could

conclude that Ms. Elby was motivated by a desire to exclude black people from Birmingham.

Although the majority of the Commissioners continued to wistfully support the Baldwin House proposal, Commissioner Kelly remained adamantly opposed. On November 7, 1977, the Commission took action that supported opponents of the Baldwin House proposal. For example, they agreed to defer a final vote on extending the Baldwin House contract. In addition, they added several amendments to the proposed contract that made it impossible for Baldwin House to continue its negotiations with MSHDA. One amendment prohibited Baldwin House from acquiring possible sites for family housing until MSHDA gave its final approval for senior-citizen housing. A second amendment provided that the contract would terminate should MSHDA require Baldwin House to construct any multi-unit family housing.[6] At its November 28 meeting, the Commission amended the Baldwin House contract and then voted to extend it for merely 60 days.[7] Although six of the Commissioners supported Baldwin House and none of the six acted out of a desire to discriminate against black people, they knew that the 60-day extension and the amendments would preclude Baldwin House from negotiating successfully with MSHDA.

On February 21, 1978, the Commission agreed to an advisory referendum for the upcoming election on April 3, 1978. April 3, 1978 was a regularly scheduled election day at which three of the seven Commissioners —Ring, Staples, and Underwood—had to run for re-election. They were challenged in the election by Gary Kain, William York and George B. Jackson, admitted opponents of the Baldwin House proposal. Some of the speeches made during the campaign were direct appeals to racial prejudices. Mr. York advised the audience attending the League of Women Voters candidates' night meeting that the housing proposed by Baldwin House would create an economic and social mix that was "biologically wrong." Campaign literature distributed prior to the election carried the same racial theme. One flyer entitled "Vote No—No" prepared by "Birmingham Neighbors" and reprinted in the *Birmingham Patriot,* urged a vote against the Baldwin House proposal because "MSHDA/HUD would fill our senior complex with non-residents," and noted that first priority for the senior and family housing would be given to "16% minorities, potentially outside of Birmingham (in senior complex and in HUD houses equal 32 units)." The flyer then endorsed the candidacy of Messrs. York, Jackson and Kain. This flyer was discussed openly at one of the Commission meetings. The Commissioners acknowledged its racial overtones. After reading the flyer, Mayor Conrad attempted to stop further distribution in Birmingham. We find that the flyer urged rejection of the Baldwin House proposal at least in part because the proposal would increase the number of blacks living in Birmingham.

A second flyer entitled "Fact Sheet— Senior-Citizen Housing" distributed by Nancy Elby's group, described MSHDA and HUD as agencies designed "to effect social change" and also stated "as HUD/MSHDA disclose other guidelines or quotas required for eligibility for occupancy, the true priorities will become evident, perhaps to the disadvantage of long-time Birmingham residents."[8] In addition to reading the flyers

---

**6.** By November, the Commission believed that the City's opposition had so crystalized, Mayor Conrad met with MSHDA and HUD officials in an attempt to eliminate the family housing requirement from the Baldwin House proposal. She told MSHDA that the requirement was jeopardizing the entire senior-citizen housing proposal and that opposition "is organizing all over town and fear is what is being stressed."

**7.** The contract extension signed the following day included a new paragraph H which provided: "Baldwin House shall not take any steps toward acquiring any interest in or providing any type of housing other than senior-citizen housing."

**8.** At the November 28, 1977 Commission meeting, the "Committee To Put The Issue On The Ballot" read parts of this flyer in opposition to the Baldwin House proposal.

being distributed, the Commissioners heard the views of a number of Birmingham residents at meetings, in correspondence and in private conversations. A February 4, 1978 letter to Mayor Conrad spoke in opposition to Baldwin House and referred to restrictions that have been placed on subsidized housing. These restrictions had to do with dwellings "being reserved for blacks when there was not a black child in the school system." Another letter opposing the Baldwin House proposal suggested avoiding any "requirement that the City artificially alter the population makeup of the community so as to provide a diverse population pool." Still another letter characterized the attempt to construct low-income housing as "socialism." And in another letter, William Rodgers, a member of the "Alternative Financing Committee" said that he was opposed to "affirmative action" and he believed that "compulsory integration" was just as wrong as "compulsory segregation." We find that these letters and others urged the Commissioners to oppose the Baldwin House proposal at least in part because they did not want black people moving into subsidized housing in Birmingham.

The Baldwin House proposal and three incumbent Commissioners were defeated at the April 3, 1978 election. Messrs. York, Jackson and Kain, the opposition candidates, were elected. After the April election, Mayor Conrad publicly stated that those opposing the ballot question had played on the racial fears of the electorate and that the vote against Baldwin House was, at least in part, racially motivated. The City's interference with the Baldwin House proposal culminated when on May 8, 1978, Commissioners Conrad, Dropiewski and Watt, the three remaining Commissioners who supported the Baldwin House proposal, were recalled from office. The three Commissioners elected on April 3, 1978 together with Commissioner Kelly appointed their replacements. This newly composed Commission never took any action to repair the damage its practices and policies had done to the negotiations between MSHDA and Baldwin House. Even though the new Commission was aware that Baldwin House

wanted its contract extended at least until September 1978, it took no action. It would have served no purpose for Baldwin House to again request an extension; it knew it had no support on the new Commission. A city that had actively interfered with the Baldwin House/MSHDA negotiations could now preclude construction of racially integrated family housing in Birmingham by simply doing nothing.

■ We conclude that the City's interference with the Baldwin House plan to construct low-income family housing was, in part, racially motivated. Among the facts that lead us to this conclusion are the views expressed by a significant number of opponents of Baldwin House (uttered both on the public record and within the hearing of those who testified at trial); a Commission that knowingly pursued policies that appeased those who expressed these bigoted views; the opinion testimony of supporters of Baldwin House describing the motivation of their opposition; the unusual sequence of events leading to the contract amendments and the Commission's decision not to extend its contract with Baldwin House; the decision to conduct an advisory referendum on the Baldwin House proposal; the extreme hostility and persistence displayed by opponents of Baldwin House in their efforts to defeat its proposal; the defeat of three commissioners at the April 3, 1978 election and the subsequent recall of the remaining three commissioners who favored the Baldwin House proposal; and the fact that Birmingham was and still is a virtually all-white community despite its longstanding open-housing ordinance.

■ The evidence establishes that Baldwin House was attempting to comply with MSHDA's 2-for-1 policy. Its application was being processed by MSHDA without encountering too much difficulty until the City became actively involved in the negotiations for low-income family housing. Prior to November 1977, the majority of the Commission supported the family housing requirement in order to obtain MSHDA financing. The City's interference in Bald-

win House's affairs was limited to dictating the type of family housing to be provided. The Commission made it known that it preferred to rehabilitate existing houses to comply with MSHDA's family-housing requirement. In the beginning that interference was not based on racial considerations. However, in November 1977, and thereafter, the City knowingly took steps that would ultimately defeat the Baldwin House proposal. These steps included limiting the extension of the Baldwin House contract; prohibiting Baldwin House from acquiring family-housing sites; and, finally, refusing to extend the Baldwin House contract beyond May 1978. One effect of terminating the Baldwin House contract was to keep Birmingham a virtually all-white city. Had Baldwin House been permitted to build low-income housing in Birmingham, approximately 16% of all tenants would have been black, and the City's minority population would have more than doubled. This discriminatory effect was foreseeable when the City terminated the Baldwin House contract.[9] After November 1977, every action the Commission took appeased the vocal opponents of the Baldwin House proposal, many of whom were motivated by a desire to exclude black people from the City and to maintain the City's virtually all-white character. The Commission knew that racial considerations were a motivating factor influencing many of those who opposed Baldwin House's proposal to build family housing. It nevertheless bowed to their wishes. We conclude, therefore, that the City is chargeable with racially discriminatory intent for the actions it took in November 1977 and thereafter to obstruct the construction of family housing.

When the Commission voted to subject the Baldwin House proposal to an advisory referendum, it did so for the sole purpose of appeasing racially motivated opponents of the proposal. This was a unique procedure in Birmingham. There had never been an advisory referendum before. The Commission knew that many of the Baldwin House opponents who were clamoring for a vote on the proposal were motivated in part by a desire to exclude black people from Birmingham. The members of the Commission received, read and discussed copies of flyers circulated in the City as well as communications from numerous citizens addressed to various commissioners. Therefore, they had knowledge of the community sentiments with respect to the Baldwin House proposal. We conclude that the City's decision to place the referendum on the ballot was motivated by a racially discriminatory intent.

We recognize that determining whether a racially discriminatory animus was a motivating factor behind the City's conduct "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." However, to establish the requisite intent, a plaintiff need not show that a discriminatory purpose was the sole motivation of the defendant's conduct. Rather, the discriminatory purpose need only be *a* motivating factor. *Village of Arlington Heights v. Metropolitan Housing Development Authority*, 429 U.S. 252, 265–266, 97 S.Ct. 555, 563–564, 50 L.Ed.2d 450 (1977) (*Arlington Heights I*); *United States v. City of Parma, Ohio*, 661 F.2d 562, 572 (6th Cir. 1981). Rarely can it be said that a governmental decision-making body operating under a broad mandate made a decision motivated by a single concern, or even that a particular concern was the "dominant" or "primary" one. In fact, it is because governmental decision-making bodies are properly concerned with balanc-

9. Prior to trial, the government argued that it need only prove that the City's actions had a proscribed discriminatory effect. *See, e.g., Arlington Heights Housing Development Corporation v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) (*Arlington Heights II*). However, following trial, the government abandoned its efforts to impose liability on the basis of discriminatory effects alone and sought to establish that defendant actually intended to discriminate on a proscribed basis. Proof of foreseeable consequences is some evidence of a racially discriminatory purpose. *Columbus Board of Education v. Penick*, 443 U.S. 449 at 465, 99 S.Ct. 2941 at 2950, 61 L.Ed.2d 666.

ing numerous competing considerations that courts are loathe to review the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is proof that a discriminatory purpose has been *a motivating factor* in a decision, this judicial deference is no longer justified. *Arlington Heights I, supra,* at 265–266, 97 S.Ct. at 563–564. Courts will consider evidence that a decision-making body took certain actions knowing it would have a discriminatory effect. This is some evidence, which when considered with other relevant evidence, may well establish that the decision-making body intended to cause that effect. *Columbus Board of Education v. Penick,* 443 U.S. 449, 464–65, 99 S.Ct. 2941, 2949–50, 61 L.Ed.2d 666 (1979); *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 536 n.9, 99 S.Ct. 2971, 2978 n.9, 61 L.Ed.2d 720 (1979).

 We agree that a finding of discriminatory intent may not be based solely upon the bigoted comments of a few citizens. A city cannot be found to have intended to discriminate unless it can be shown that racial considerations were a motivating factor among a significant percentage of those who were responsible for the city's conduct. *Arlington Heights II, supra* at 1292. The government need not prove that the Commission itself intended to discriminate on the basis of race in order to establish that the City acted with a racially discriminatory intent. In order to demonstrate a city's racially discriminatory intent, it is sufficient to show that the decision-making body acted for the sole purpose of effectuating the desires of private citizens, that racial considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the motivations of the private citizen. *United States v. City of Blackjack, Missouri,* 508 F.2d 1179, 1185 n.3 (8th Cir. 1974). Any other rule of law would permit a legislative body to place its official stamp of approval on private racial discrimination. The Supreme Court has consistently struck down any such state action. *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed.2d 1161 (1947).

The defendant argues that courts may not examine the motivation of voters in a referendum. We disagree. It is true that our power to require a voter to explain how and why he/she voted is extremely limited. *See Arlington Heights, I, supra,* at 268, 97 S.Ct. at 565. It is also true that a court may not enjoin a city from conducting a referendum simply because the referendum might provide the city with a vehicle to carry out racial discrimination. This is so because referenda are a legitimate part of the democratic process. *James v. Valtierra,* 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971); *Ranjel v. The City of Lansing,* 417 F.2d 321 (6th Cir. 1969), *cert. denied,* 397 U.S. 980, 90 S.Ct. 1105, 25 L.Ed.2d 390 (1970). But when the referendum has been conducted, we may examine the motivation of the electorate in order to determine whether a city has acted out of racially discriminatory motives. *Id.* at 325. When it adopted the Fair Housing Act, Congress clearly intended to subject the conduct of the people acting directly by way of referendum to the same scrutiny that courts apply to the acts of governmental decision-making bodies. We do not believe that Congress intended to permit cities to practice racial discrimination with impunity by the simple expedient of adopting all discriminatory policies by popular vote. The Supreme Court tacitly approved judicial scrutiny of the motivation of an electorate in *Hunter v. Erickson,* 393 U.S. 385, 392, 89 S.Ct. 557, 561, 21 L.Ed.2d 616 (1969) stating:

> [I]nsisting that a state may distribute legislative power as it desires and that the people may retain for themselves the power over certain subjects may generally be true, but these principles furnish no justification for a legislative structure which otherwise would violate the fourteenth amendments. Nor does the implementation of this change through popular referendum immunize it. *Lucas v. Colo-*

*rado General Assembly*, 377 U.S. 713, 736–37 [84 S.Ct. 1459, 1473–74, 12 L.Ed.2d 632] (1964). The sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed.

*But see Kirksey v. The City of Jackson, Mississippi*, 663 F.2d 659 (5th Cir. 1981). In any event, the April 1978 referendum was advisory and not binding on the Commission. Thus, by examining the motivation of those who voted in an advisory referendum, we are not scrutinizing the conduct of people acting in a legislative capacity. Rather, we examine the motivation of those who voted against the Baldwin House proposal simply to gather additional information concerning the basis of opposition to the proposal.

■ Following the referendum, the Commission failed to extend its contract with Baldwin House, despite a longstanding request from Baldwin House that it do so. By April 1978, four members of the Commission were openly opposed to the Baldwin House proposal. Racial concerns were a motivating factor behind the opposition of at least two of the four members of the majority faction. That fact alone may be sufficient to attribute a racially discriminatory intent to the City. Regardless of their personal views, all four members felt bound by the results of the April 3, 1978 referendum not to proceed with the Baldwin House proposal. They were aware that a signifi-

cant number of the opponents of Baldwin House were motivated in part by a desire to exclude black people from the City. We find, therefore, that the City is chargeable with racially discriminatory intent in its failure to carry forward with the Baldwin House proposal after April 1978.[10]

■ We agree with defendant that the Fair Housing Act does not impose any affirmative duty upon governmental bodies to plan for, promote, or construct any type of housing. Allegations that a city made plans to construct low-income housing and later abandoned those plans are insufficient to state a claim for violation of the Act or the United States Constitution. *Acevedo v. Nassau County, New York*, 500 F.2d 1078, 1081–82 (2d Cir. 1974). However, the circumstances under which such plans are abandoned are relevant in determining whether a city acted with racially discriminatory intent. In *Acevedo*, the plan to construct housing was in its very preliminary stages at the time it was abandoned. In such a case, a court should be reluctant to find that the decision to abandon was motivated by discriminatory intent because the factual record is likely to be sparse. But where, as here, a plan to build low-income housing has undergone development over a number of years and is abandoned because of the unnecessary interference by the city, there will often be ample evidence allowing a court to determine whether a city acted with racially discriminatory intent.[11]

---

**10.** The defendant relies primarily upon four cases to support its argument that it has not violated the Act: *Joseph Skillken and Company v. The City of Toledo*, 528 F.2d 867 (6th Cir. 1975), *vacated on remand* 429 U.S. 1068, 97 S.Ct. 800, 50 L.Ed.2d 786 (1977), *reaffirmed on remand*, 558 F.2d 350 (6th Cir.), *cert. denied*, 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977); *Citizens Committee for Faraday Wood v. Lindsay*, 507 F.2d 1065 (2d Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1679, 44 L.Ed.2d 102 (1975); *Mahaley v. Cuyahoga Metropolitan Housing Authority*, 500 F.2d 1087 (6th Cir. 1974); *Acevedo v. Nassau County, New York*, 500 F.2d 1078 (2d Cir. 1974). None of these cases is relevant here because none involved a finding that the defendant had engaged in intentional racial discrimination. Moreover, the Sixth Circuit has recently cast doubt on the applicability of *Mahaley* and *Skillken* to suits

brought under the Fair Housing Act. The court in *City of Parma, supra* at 574, a case brought under the Act, distinguished *Mahaley* by noting that it involved a suit brought under the Housing Act of 1937 and not the Fair Housing Act, and distinguished *Skillken* by noting that its holdings were not based upon a construction of the Fair Housing Act.

**11.** Our analysis takes into account the fact that Birmingham, unlike *Acevedo*, did not abandon its own inchoate plan to construct family housing. Rather, Birmingham was being asked to play only a peripheral role (*see* fn. # 5, *supra*) in a private group's plan to construct family housing and it then took action that interfered with that plan. In such a case, we should not hesitate to examine the motivation behind that interference.

The City argues that it did nothing to interfere with Baldwin House's freedom to build senior-citizen housing on a properly zoned site other than the Baldwin School site or to build family housing without also building senior-citizen housing on the Baldwin School site. Even if the City's argument were factually correct, it misses the mark. We are concerned with one particular proposal put forward by Baldwin House. Although Baldwin House did not originally intend to build family housing, it later voluntarily agreed to do so in order to meet MSHDA requirements for financing. It would have complied with MSHDA's requirements, except for the City's interference. The issue for our consideration is whether the City's interference with the Baldwin House/MSHDA negotiations was racially motivated, not whether the City might have acted differently in response to some hypothetical plan by Baldwin House to build low-cost housing on other sites.

The City contends that the overriding concern among those who opposed Baldwin House was the belief that low-income housing would lower property values. The City argues that it is not a violation of the Act for citizens to oppose construction of low-cost housing based on their concern over lowered property values, *Skillken, supra*, at 881, and that the City has no responsibility under the Act to show that these concerns were justified. We agree with the City that whether the concerns regarding lowered property values were justified is irrelevant. The Fair Housing Act does not proscribe actions based upon undocumented fears. Rather, the Act proscribes actions taken because of the race, color, sex or national origin of persons seeking housing. We do not agree, however, that the Act protects the City's attempts to provide blanket protection to all those who based their opposition to Baldwin House on fear that property values might drop. In order to determine whether the Act has in fact been violated, we must determine the basis for the fear that construction of low-income housing might lead to a reduction of property values. No doubt some opponents of Baldwin House really believed that an influx of poor people, black or white, . who might not maintain their property could cause property values in the City to decrease. A city may well be within its rights to oppose low-income housing out of a desire to exclude all poor people; neither the Fair Housing Act nor the United States Constitution so far as we know prohibits discrimination on the basis of wealth. On the other hand, it is clear that a large number of opponents of Baldwin House based their opposition on a belief that an influx of black people would cause property values to decrease, either because they might not maintain their property or because the presence of black people would decrease the attractiveness of Birmingham to white people desiring to live in an all-white community. A city that takes steps to exclude black people violates the Fair Housing Act, regardless whether they do so out of a desire to protect property values and not out of any animus against black people generally. A person who attempts to prevent a black family from buying the house next door because the. presence of a black family on the block will decrease property values violates the Fair Housing Act just as assuredly as a person who attempts to prevent a black family from buying the house next door because that person dislikes all black people. The evidence here establishes that a significant percentage of those who opposed Baldwin House out of fear that property values might decline, based their fears on the belief that an influx of black people into a community decreases property values. This is the basis of Commissioner Kelly's fears when he said "the history of HUD and these people is to destroy." In fact, Commissioner Ring testified that *a majority* of concerns expressed to him in private prior to the April 1978 referendum were to the effect that family housing would lead to an influx of black people into the City, and that, in turn, might lead to a reduction in property values. To the extent that the City acted as it did in response to such fears, the City violated the Fair Housing Act.

■ Finally, the City carefully points out that MSHDA had not agreed to issue its mortgage commitment, had not agreed that the Baldwin House proposal was even feasible for a mortgage loan, and had not agreed to accept the proposed mix of newly constructed and rehabilitated housing. From this, the City argues that even if its interference with Baldwin House's plans to construct low-income housing was motivated in part by racial considerations, the result would be the same and, in such circumstances, there is no justification for judicial interference with the challenged decision. Although it is true that as of May 1978 MSHDA still had not finally determined that the Baldwin House proposal was economically feasible, the City did not submit evidence to establish that the Baldwin House proposal was not feasible and never would have been built in any event. Nor did the City offer evidence to establish that Baldwin House and MSHDA never would have agreed on an acceptable mix of new and rehabilitated housing to make up the required 75 units of family housing. On the other hand, there is evidence that Baldwin House's housing consultant and a MSHDA staff member both preliminarily determined that the proposal was economically feasible regardless of the mix employed. Moreover, MSHDA had enough confidence in the proposal to grant Baldwin House a seed loan. In the past, in almost all cases in which MSHDA granted a seed loan, the proposed housing was actually built. We find that the preponderance of the evidence establishes that, but for the actions of the City, Baldwin House's proposal would have become a reality. Accordingly, we conclude that, by acting to block the Baldwin House proposal, in part because of its desire to exclude black people from the City, Birmingham made housing unavailable to certain individuals on the basis of their race in violation of § 804(a) of the Fair Housing Act. We further conclude that the City interfered with the right of a group of persons to seek housing in Birmingham because of their race in violation of § 817 of the Act. Accordingly, we will enter judgment in favor of the plaintiff on the issue of liability.

IT IS SO ORDERED.

### JUDGMENT

The court having previously entered a partial judgment on the issue of liability, and the court having afforded the parties a hearing on the issue of remedy,

NOW, THEREFORE, IT IS ORDERED AND ADJUDGED:

1) that the City of Birmingham, its Mayor, each of its Commissioners, the City Manager, all Officers and Employees of the City and all those acting in concert with them who have notice of this injunctive order are hereby permanently restrained from engaging in any conduct that interferes with Baldwin House's efforts to construct low-income family and senior citizen housing within the City of Birmingham;

2) that the City of Birmingham shall forthwith reinstate its contract with Baldwin House, dated December 6, 1976, except that such contract will be amended to provide Baldwin House with the option to purchase within two and one-half years from this date the southern portion of the Baldwin School site; the northern boundary of that parcel of land is the center line of vacated Martin Street; PROVIDED, HOWEVER, that the contract shall specify that Baldwin House may obtain upon its request an automatic extension of that contract for two, six-month periods; PROVIDED FURTHER, that Baldwin House shall obtain additional extensions by petitioning the court for an appropriate order extending the contract beyond the expiration date of the second six-month extension; PROVIDED FURTHER, that the contract shall specify that Baldwin House may, at its sole discretion, include some low-income family housing units as a part of any elderly housing complex constructed on the site;

3) that the City of Birmingham and all of its Officials and Employees above named shall take all reasonable affirmative steps to assist Baldwin House in its performance under the contract, including but not limit-

ed to assisting Baldwin House with applications filed by Baldwin House to obtain mortgage financing and/or grants for rent subsidies; locating appropriate sites within the City suitable for constructing low-income family housing; locating existing housing suitable for substantial rehabilitation; and granting Baldwin House's reasonable requests for zoning variances; Baldwin House shall be free to provide low-income family housing by substantial rehabilitation of existing housing and by the construction of new, single or multiple unit family housing;

4) that Baldwin House shall at all times remain free to determine, with approval of the court, the number of low-income housing units to be constructed and to determine the ratio of low-income senior citizen units to low-income family units; PROVIDED, HOWEVER, that the ratio of family to elderly housing shall be consistent with the housing needs of those living and working in the Birmingham area, as determined by any Housing Assistance Plan (HAP) prepared or to be prepared by the City of Birmingham or by Oakland County; PROVIDED FURTHER, that such ratio shall also be consistent with criteria established by the Michigan State Housing Development Authority (MSHDA) and/or the Department of Housing and Urban Development (HUD);

5) that the City of Birmingham shall provide to residents of any housing constructed on the Baldwin School site, reasonable access to the city-owned parking lot located north of the center line of vacated Martin Street; such residents shall be permitted to use the parking lot free of charge to the extent that such use does not interfere with the parking needs of adjacent land owners;

6) that if the contract between Baldwin House and the City is due to expire and Baldwin House has not succeeded in obtaining mortgage financing for construction of low-income family and senior citizen housing and has not obtained a commitment for rent subsidies, Baldwin House shall, through counsel for plaintiff, petition the court for a hearing to determine alternative methods and sources for obtaining such mortgage financing and rent subsidies;

7) that any application filed by Baldwin House with MSHDA and HUD for mortgage financing and rental subsidies shall indicate that the application is being filed pursuant . to a judgment entered by the court;

8) that the City of Birmingham shall act expeditiously upon any and all applications filed by Baldwin House for building permits, zoning variances and tax abatements in connection with Baldwin House's efforts to construct low-income family and senior citizen housing within the City of Birmingham;

9) that the City of Birmingham shall cooperate fully with any affirmative marketing campaigns undertaken by Baldwin House designed to induce blacks and members of other minority groups to apply for occupancy in the low-income housing so constructed;

10) that Baldwin House shall, through its housing consultant, file periodic reports (every 120 days) with the court and counsel detailing the progress being made in its effort to construct low-income housing in the City of Birmingham; such reports shall describe any problems and obstacles being encountered in the processing of any application filed to obtain necessary financing and/or in the construction of low-income housing;

11) that the court's jurisdiction in this matter shall be continuing to provide amendments to this Judgment as required in order to assure that low-income family and senior citizen housing is constructed by Baldwin House in the City of Birmingham.

In all other respects this Judgment shall be final.