### PEOPLE HELPERS, INC., et al, Plaintiffs,

v.

### CITY OF RICHMOND, et al, Defendants.

#### No. 91–682.

United States District Court, E.D. Virginia, Richmond Division.

April 13, 1992.

Richmond, Va., for People Helpers, Inc., et al.

George Timothy Oksman, Michele Anne Gillette, Office of the City Atty., Richmond, Va., for City of Richmond.

Herndon Philpott Jeffreys, Jr., and John Adrian Gibney, Jr., Shuford, Rubin, Gibney & Dunn, Richmond, Va., for Joyce Riddell and William T. Riddell.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter is before the Court on the Defendant City of Richmond's (the "City") Motion for Summary Judgment, pursuant to Fed.R.Civ.P. 56. For the reasons stated below, this motion is DENIED.

On January 16, 1992, this Court denied Defendants Joyce and William Riddell's Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Subsequently, on January 29, 1992, the Court granted the City of Richmond's Motion to Dismiss as it pertained to Plaintiffs Rebecca and Gary Thomas, but denied the City's Motion in regards to People Helpers and Robert Elam, the chief operating officer of People Helpers. Thus, in the instant motion, the City is asking for summary judgment against Mr. Elam and his organization, People Helpers. This case is set to go to trial on April 27, 1992.

## I. FACTUAL BACKGROUND

### A. *General Information*

Plaintiff People Helpers, Inc. is a nonprofit Virginia corporation whose mission includes finding decent and affordable housing within neighborhood communities for individuals with mental and physical handicaps. In many instances, these individuals are black. In February of 1991, People Helpers rented apartments in and eventually purchased the building at 1207–09 West 47th Street in the City of Richmond (the "Building"). Subsequently, People Helpers moved in a number of handicapped individuals into the Building as tenants.

The Plaintiffs allege that the Defendant City of Richmond, through several of its agents, committed acts designed to frighten and to intimidate the Plaintiffs and thereby stop them from continuing to house physically and mentally handicapped individuals in the Building. Based upon these allegations, the Plaintiffs contend that the City violated their right to provide housing to blacks and disabled people free from intimidation, interference, and coercion pursuant to 42 U.S.C. § 3617 and Virginia Code § 36–96.5. They seek damages, permanent injunctive relief, and a declaratory judgment against the City.

### B. *The Allegations of the City*

The City maintains that the evidence in the case lays out the following scenario: In the Spring of 1991, the City's Chief of Staff, Joyce Wilson, was called by Defendant Joyce Riddell concerning the Building. Mrs. Riddell complained at great length about various objectionable activities going on there, including prostitution, drug addicts, overcrowding, and panhandling. (Wilson Aff. § 2) She also expressed her deep concern to Ms. Wilson about the "type" of person who was moving into the Building. *Id.* At about the same time, Mrs. Riddell made similar complaints to Councilman Charles Perkins, and Mr. Perkins asked Ms. Wilson to make the appropriate inquiries. In early July, Ms. Wilson contacted Lt. John Carlson of the Richmond Bureau of Police and asked him to look into the activities going on in the Building. *Id.* at § 5. Lt. Carlson then ordered two vice detectives, Harry Pherson and Randy Clouse, to investigate. (Carlson Aff. at § 4.)

Independently of Ms. Wilson's involvement and before she took any action on the complaints, another neighbor, Mrs. Diana Rollins, complained about the property to Ms. Eileen Wimbish, a city zoning officer. Although Ms. Wimbish admits that Mrs. Rollins made some statements indicative of biased and improper motives, her complaints did make out some possible violations of the City's zoning ordinance, including the illegal use of the Building as a "lodging house" or "nursing home."

(Wimbish Aff. at §§ 3–4.) After obtaining authorization from her supervisor, Ms. Wimbish began looking into the matter. She learned that the property (then not owned by People Helpers) lacked a necessary document called a "certificate of zoning compliance" and asked the owner of the Building to apply for it. *Id.* at §§ 5–6.

Detectives Pherson and Clouse visited the Building on July 10, 1991. The detectives claim that they went to several apartments in the building and that the tenants spoke to them willingly. (Pherson Aff. at §§ 5–9.) Some but certainly not all of the tenants were clients of People Helpers. Detective Pherson states that two tenants who were not clients of People Helpers complained that the People Helpers clients were contributing to the excessive noise and public drunkenness in the Building. One of the tenants claimed that People Helpers was overcharging its clients for rent. *Id.* at § 12. Mr. Robert Elam arrived in the midst of the investigation and demanded to know what was going on. He briefly described People Helpers and his affiliation with it to the detectives. *Id.* at § 11.

Pherson and Clouse went back for a second investigation a few days later and spoke with tenants and friends of tenants who gave them the impression that People Helpers was billing multiple occupants of the same apartment for the full apartment rent. *Id.* at § 14. Despite their suspicions of fraud, the two detectives concluded that there was not sufficient evidence to prosecute either People Helpers or the Building owner. They reported their findings to Lt. Carlson and then closed their investigation of the Building. *Id.* at § 15.

Carlson, however, was not completely satisfied. He called the rental agent for the Building who confirmed that several apartments were being rented by People Helpers. (Carlson Aff. at § 6.) Next, Lt. Carlson contacted Social Security to ask about the process by which federal Social Security benefits are assigned to third parties, although he states that to the best of his recollection he never mentioned People Helpers or the reason for his inquiry. *Id.*

at § 7. Lt. Carlson conducted no further investigation at this time and reported his findings to Joyce Wilson, the City's Chief of Staff.

Like Lt. Carlson, Ms. Wilson was unexplainably unsatisfied with what the investigation had turned up so far. Based on her experience, she somehow concluded that the complaints about the property fit the familiar pattern of an improperly supervised home for adults. (Wilson Aff. at § 6.) To further investigate, Ms. Wilson called Robert Elam who reacted in a way she labels as "assertive, defensive, argumentative, and very talkative." *Id.* at § 7.

Shortly thereafter, Elam and his attorneys requested a meeting which took place on August 1, 1991. Present at the meeting were Ms. Wilson, Lt. Carlson, another police officer, Mr. Elam, counsel for People Helpers, and Mr. Elam's personal attorney. *Id.* at § 8. At the meeting, People Helpers explained its activities in detail and Mr. Elam even offered to let the City review his personal records, which it declined to do. (Carlson Aff. at § 9.) Elam denied at the meeting that there was any client misbehavior, claiming that People Helpers did not deal with anyone needing a case manager, such as mentally ill people or mentally handicapped people; he said further that his clients were mostly persons who needed help managing their money, such as recovering alcoholics and recently released jail inmates. (Wilson Aff. § 8.) People Helpers' position was that any neighborhood complaints about tenant misconduct were pretextual lies offered to mask racism and other improper motives. *Id.* at § 9. It is the City's view that the meeting ended inconclusively. *Id.*

The very next day, August 2, 1991, Mrs. Wimbish (the City's zoning officer) made an inspection of the Building. The inspection was conducted with another City official and was accompanied by Mr. Elam and by a representative of the Building's owner. (Wimbish Aff. at § 9.) Mrs. Wimbish looked at most but not all of the apartments for evidence of illegal use, and she found none. *Id.* at § 8. Due to the fact that Mr. Elam "talked continuously," Mrs.

Wimbish claims that she had to spend more time in the People Helpers apartments than in the others. *Id.* at § 9. Mrs. Wimbish inspected the leases Mr. Elam had brought with him and found nothing unusual or improper in them. Two days later, the certificate of zoning compliance was issued to the owner of the Building, and the City's chief zoning officer wrote an unequivocal letter indicating that the Building was not in violation of the zoning ordinance. (Letter of Roy Benbow to Joyce Wilson.)

Meanwhile, Mrs. Riddell kept up her campaign against the Building and its occupants. She continued to call Ms. Wilson and Lt. Carlson with complaints and persisted in her efforts to get the City to shut People Helpers down. (Wilson Aff. at § 10.) According to Ms. Wilson, Mrs. Riddell no longer made any allegations of specific tenant misconduct, but she did voice concerns about "black tenants on welfare and 'section 8'ers' living in the [B]uilding." *Id.* In addition, at a meeting between some of the key players that was intended to be private, Mrs. Riddell chose to bring a full entourage of angry neighbors with her. One neighbor stated that "apartments should rent to the same calibre of people who already live in the neighborhood." *Id.* at § 11.

In October of 1991, after receiving complaints from Mrs. Riddell of panhandling, disturbances of the peace, public urination, public fighting, and building code violations, Lt. Carlson again decided to call Mr. Elam and arranged to meet Elam at the Building. (Carlson Aff. §§ 10–11.) Mr. Elam took Lt. Carlson through several apartments, and Carlson was genuinely impressed by the improvements Elam had made. *Id.* at § 12. Lt. Carlson then offered to serve as a mediator between People Helpers and the neighborhood. Mr. Elam agreed and the two men parted on good terms, according to the City. *Id.* at § 13.

Later that same day, Carlson states that he met with a contingent of irate neighbors. Lt. Carlson told the group that in his opinion the property was not a public nuisance and could not be prosecuted as such.

*Id.* at §§ 14–15. He then contacted Mr. Elam again in order to try to alleviate some of the neighbors complaints. According to Lt. Carlson, Mr. Elam became argumentative, defensive, and uncooperative. He also reportedly referred to himself as the "savior" of the neighborhood and likened himself to Jesus Christ. *Id.* at § 16. Shortly thereafter, Carlson learned that this law suit had been filed.

In sum, the City maintains that the tenants in the Building were engaging in objectionable behavior—much of it illegal—which caused disruption to the normal lives of many citizens of the surrounding environs. The City openly admits that some of these neighbors unquestionably had improper motives, based on race, class, or social caste. However, City officials believed many of the complaints to be credible and thus felt obligated to conduct reasonable and restrained inquiries under the circumstances. Eventually, the City concluded that there was no basis for prosecuting People Helpers or anyone associated with it for a violation of law and even passed up numerous opportunities to make life difficult for People Helpers.

### C. The Allegations of the Plaintiffs

To no one's great surprise, People Helpers and Robert Elam, its chief operating officer, take a much different view of the events described above. In essence, People Helpers alleges that under the pretext that the City was properly responding to legitimate citizen complaints, the City attempted to find a way to shut down the Building.

The Plaintiffs claim that the focus of the City's investigation changed each time it uncovered facts that tended to exonerate People Helpers or Robert Elam of any specific wrongdoing. Reportedly, this was done because the investigations were not important in and of themselves but only as a device that could be used to shut down the Building. (Elam Aff. at § 3.) When no basis could be found to prosecute the five People Helpers tenants for criminal activities, the investigation turned to zoning problems. After no building code or zoning violations were uncovered, the City re-

focused its inquiries into whether Robert Elam had committed some type of fraud. No fraud was found so the City began considering so-called conflict of interest violations. (Wimbish Aff. at § 14.) People Helpers states that all these investigations were conducted in bad faith and were designed to threaten and intimidate the Plaintiffs from providing housing to people with mental and physical disabilities.

The City readily admits that its agents at all levels were aware that the complaints of the neighbors regarding disturbing tenant behavior may have been motivated by racism or other improper motives.[1] However, the City argues that there was such a high level of inappropriate and/or illegal activity in the Building that there can be no serious debate about the City's motives in conducting an investigation into the use and occupancy of the Building.

People Helpers counters by stating that the City's argument is both misleading and based on unfounded accusations of misbehavior. Based on the records of the Crime Analysis Unit of the City Bureau of Police, the Plaintiffs point out that since May of 1991, only three criminal complaints were made with regard to the Building,[2] and there is no evidence that any of these incidents were related to the clients of People Helpers. (Pl. Exh. 1.) In fact, the former owner of the Building, Mr. E.T. Lacy, states in his affidavit that there was no change in the type or number of problems in the Building after the clients of People Helpers started moving in. (Lacy Aff. at § 5.) Furthermore, despite acute political pressure being applied on a number of different fronts, there are no written complaints on file at the police department supporting suspicions of zoning violations, building code infractions, or fraudulent activity. The person who owned the Building before it was purchased by Mr. Elam and who served as rental agent puts the case bluntly:

> The increase in the number of complaints made by the neighbors was triggered when they saw the furnishings which People Helpers moved into the Building on several occasions. The fact that there was a serious increase in problems with tenants in the Spring of 1991 was, and still is, a sham. *Each City officials [sic] with whom I dealt from the zoning, building code and police departments was aware that these complaints were groundless, but the City used the complaints as a pretext for the City to pressure Robert Elam and People Helpers from using the Building.* The City was motivated, at least in part, by political pressure from the neighbors.

(Lacy Aff. at § 6.) (emphasis added) Mr. Lacy's contention is supported by the fact that in the Spring of 1991, when citizen complaints of illegal activity were at a high point, only five People Helpers clients had moved into the Building. (Elam Aff. at § 3.) It seems unlikely that these five men could possibly have been responsible for all of the acts attributed to them by the City and the Riddells. Indeed, the City's own investigation never turned up any evidence linking the tenants of the Building to illegal activity.

More importantly, People Helpers maintains that the most telling indicator of the City's behavior is the fact that once the investigations had yielded no information that any illegality had occurred, it continued to press its investigation forward. (Lacy Aff. at § 7.) In light of the fact that the City was well aware of the illicit motives of the neighbors, the decision to continue to probe into Mr. Elam's activities and those of his organization is certainly suspect.

Moreover, the affidavits submitted by the Plaintiffs state that City officials them-

---

1. The City acknowledges that Councilman Charles Perkins, Chief of Staff Joyce Wilson, Zoning Officer Eileen Wimbish, and Lt. John Carlson all were aware or suspected that the complaints of the neighbors regarding People Helpers were motivated at least in part by racial animus or other improper motives.

2. The three specific incidents were: (1) a residential breaking and entering; (2) a stolen vehicle; and (3) a grand larceny. (Pl. Exh. 1.)

selves were specifically motivated by a hatred for minorities and people with mental and physical disabilities. Lt. John Carlson told Mr. Elam that as long as the neighbors were upset and so long as blacks and disabled individuals remained in the building, the police would continue to investigate the Building's tenants, People Helpers, and Elam. (Elam Aff. at §§ 10–11.) At one point Carlson told Elam that when he finds something wrong with his behavior, he will "personally put the hand cuffs on [Elam] and take [him] away to jail." *Id.* at § 10.

The Plaintiffs also take a negative view of the questioning conducted at the Building by Detectives Pherson and Clouse. They report that the detectives "bullied" their way into the apartment of a People Helpers client and were selectively searching only the People Helpers' apartments. *Id.* at § 5. Mr. Elam also states that it was apparent that the detectives were not even curious about the neighbors' allegations of drug activity, overcrowding, prostitution, and other such matters. According to the Plaintiffs, one People Helpers client moved out of the Building solely because of the harassment he received at the hands of the Richmond police. *Id.* at § 6.

In sum, the affidavits and briefs submitted by the Plaintiffs allege that the City of Richmond was not simply engaged in a good faith investigation of complaints made by citizens. Instead, the City used its police power to help a white middle class neighborhood exclude people because they are black and/or disabled.

## II. DISCUSSION OF AUTHORITY

### A. *Summary Judgment*

A grant of summary judgment should be granted if, after reviewing the pleadings, depositions, interrogatories, and affidavits, the Court is satisfied that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Temkin v. Frederick County Commissioners*, 945 F.2d 716, 718 (4th Cir.1991) (citing *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984)). In reviewing the evidence as it relates to a motion for summary judgment, the court must view all

evidence in the light most favorable to the nonmoving party. *Shealy v. Winston*, 929 F.2d 1009 (4th Cir.1991).

### B. *The Fair Housing Act*

This case concerns alleged violations of the Federal Fair Housing Act of 1968 (the "Act"). The Act was established by Congress to insure that people who have historically suffered from discrimination in the housing markets would have an equal opportunity to housing. Although most of the legislation is designed to prevent illegal discrimination on the part of housing providers, one provision specifically prohibits unrelated third parties from interfering with anyone who is attempting to aid others protected under the Act from obtaining housing of their choice. 42 U.S.C. § 3617 states:

> It shall be unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted under or protected by §§ 3603, 3604, 3605 or 3606 of this Title.

This provision is part of a broad legislative plan to eliminate all traces of discrimination within the housing field.

The Fair Housing Act is "broad and inclusive" in protecting against conduct which interferes with fair housing rights and is subject to "generous construction." *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209, 212, 93 S.Ct. 364, 366–67, 368, 34 L.Ed.2d 415 (1972). Although there have not been many cases addressing § 3617, it is clear that this provision "protects persons who aid or encourage others in securing rights to equal housing opportunities and conditions by making it unlawful to coerce, intimidate, threaten or interfere with them because of their aid or encouragement." *Meadows v. Edgewood Management Corp.*, 432 F.Supp. 334, 335 (W.D.Va.1977); *see also, Smith v. Stechel*, 510 F.2d 1162, 1164 (9th Cir.1975) (holding that § 3617 deals with situations where housing rights have actually been respected by persons who suffer consequent retal-

iation and with situations in which the fundamental inequity of a discriminatory housing practice is compounded by coercion, intimidation, threat, or interference).

■ In order to make out a violation of § 3617, Plaintiffs must satisfy four elements. First, they must show that the residents of the Building are protected classes under the Fair Housing Act. Next, People Helpers must prove, by a preponderance of the evidence, that they actually aided or encouraged the protected individual or group in the exercise or enjoyment of rights under 42 U.S.C. § 3604 to equal services and conditions of housing. *See, Meadows,* 432 F.Supp. at 335.

The third factor necessary for Plaintiffs to succeed on their claim is that they must prove either intentional discrimination or discriminatory impact. *Oxford House–Evergreen v. City of Plainfield,* 769 F.Supp. 1329, 1343 (D.N.J.1991); *see also, Casa Marie, Inc. v. Superior Court of Puerto Rico for Dist. of Arecibo,* 752 F.Supp. 1152, 1168 (D.C.Puerto Rico 1990) (under Fair Housing Act plaintiff must show discrimination was in some part the basis for the action, but does not need to show that discrimination was the sole motivating factor). This demands the Court to engage in a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.

Finally, under § 3617, plaintiffs must show coercion, intimidation, threat, or interference on account of their having aided or encouraged the exercise of the residents' right to live in the neighborhood of their choice. *Oxford,* 769 F.Supp. at 1344.

The first and second factors of this test are not in dispute. People Helpers clearly aided handicapped and black individuals in securing access to housing. Both blacks and handicapped persons are protected classes under the Fair Housing Act. 42 U.S.C. §§ 3604(a), (b), and (f)(1).

■ As to the third and fourth factors of the test, the conflicting affidavits submitted by the parties show that there are genuine issues of material fact to be resolved at trial. The City claims that its investigations were merely reasonable responses to citizen complaints—nothing more. By contrast, the Plaintiffs maintain that the City engaged in a systematic and intentional scheme to rid the neighborhood of members of protected classes under the Fair Housing Act, and this contention is supported by appropriate affidavits.[3]

■ Moreover, the Plaintiffs need not prove that the City itself intended to discriminate on the basis of race or handicap in order to establish that the City acted with a discriminatory intent. It is sufficient for Plaintiffs to show that the City acted for the sole purpose of effectuating the desires of its private citizens, that racial or other improper considerations were a motivating factor behind those desires, and that City decision makers were aware of the motivations of the private citizens. *United States v. City of Birmingham,* 538 F.Supp. 819, 828 (E.D.Mich.1982); *see United States v. Black Jack,* 508 F.2d 1179, 1185 n. 3 (8th Cir.1974). Given the admissions made by the City officials that they were well aware of discriminatory motives behind the actions of the Riddells and the other neighbors, this test appears to be satisfied.[4]

---

**3.** On this issue, the Fourth Circuit has recognized that:

> Municipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority. Even individuals acting from invidious motivations realize the unattractiveness of their prejudices when faced with their perpetuation in the public record. It is only in private conversation, with individuals assumed to share their bigotry, that open statements of bigotry are made, so it is rare that these statements can

be captured for purposes of proving racial discrimination in a case such as this.

*Smith v. Town of Clarkton,* 682 F.2d 1055, 1064 (4th Cir.1982).

**4.** The Court notes that Mrs. Joyce Riddell is a former Richmond City councilwoman and was formerly employed by the City of Richmond's Attorney's Office as a secretary. At the trial of this case, it may be established by the Plaintiffs that Mrs. Riddell, due to her past relationships and close contacts with City officials, exerted more pressure and had greater influence than the average citizen would have had in getting

Finally, there is a genuine issue of material fact in regards to whether the City committed interference or intimidation sufficient to establish a violation of § 3617. The City states that its limited inquiries into the Plaintiffs' activities in the Building in no way interfered with People Helpers' mission and was more in the nature of a brief but necessary inconvenience. No principal or client of People Helpers was ever arrested, prosecuted, beaten up, or forced to suffer any other indignity on account of their efforts to secure equal services and conditions of housing for protected classes under the Act.

■ However, the Plaintiffs tell a different tale. They specifically allege that Richmond detectives and other City agencies threatened them with continuing criminal investigations, although there was no factual basis to support such inquiries. Mr. E.T. Lacy was threatened by Lt. Carlson with a grand jury subpoena if he refused to answer certain questions concerning the occupants of the Building. (Lacy Aff. at § 3.) It is also alleged that a People Helpers client was actually forced out of the Building rather than face further police harassment. (Elam Aff. at § 6.) In addition, several of People Helpers' financial contributors expressed their concern that Mr. Elam had been involved in fraudulent or criminal activity when they got wind of the police investigations. *Id.* at § 12.[5]

These conflicting allegations on the part of the City and People Helpers lead to the unmistakable conclusion that summary judgment would not be appropriate in this case. There are any number of factual issues concerning the degree of interference with People Helpers' activities on the City's part and the possible improper motivations behind such interference. Such issues should be resolved by a jury at the trial on the merits.

### C. *Respondeat Superior*

■ The City claims that it cannot be held responsible for the acts of its employees absent evidence that they were acting pursuant to an established municipal policy or custom. In other words, the City argues that as in § 1983 cases, the theory of respondeat superior is inapplicable in Fair Housing Act cases. *See Monell v. Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Court disagrees.

■ The Supreme Court's decision in *Monell*, that respondeat superior was not applicable to § 1983 suits is confined to the peculiar characteristics of that statute. With respect to other civil rights statutes, the general rule is that respondeat superior does apply. *Bonner v. Lewis*, 857 F.2d 559, 566 (9th Cir.1988); *Patton v. Dumpson*, 498 F.Supp. 933, 942 (S.D.N.Y.1980). "In other than section 1983 actions [an] employer would ordinarily ... be held liable for [the] misconduct [of its employees] if it occurred during the performance of

---

the City to act on her behalf. However, at this stage of the proceedings, this contention need not be established to defeat the City's motion for summary judgment.

**5.** Although these acts of the City do not concern the kind of physical violence that was present in *Sofarelli v. Pinellas County*, 931 F.2d 718, 722 (11th Cir.1991) (leaving a note threatening "to break [plaintiff] in half" if he did not get out of the white neighborhood) or *Stackhouse v. De Sitter*, 620 F.Supp. 208, 211 (N.D.Ill.1985) (fire-bombing minority plaintiff's car in order to drive him away from the previously all-white neighborhood), when the full weight of the City is brought to bear on a person and where criminal and other types of investigations are threatened in order to discourage Plaintiffs from helping minorities find suitable housing, then it cannot be said that interference, coercion, or intim-

idation of the type contemplated by § 3617 did not occur.

Whether the acts of the City actually interfered with the Plaintiffs in some way is a question of fact. Neither the cases nor the legislative history of § 3617 attempt to define the minimum level of intimidation or coercion necessary to violate this statute. Therefore, the Court assumes that the words of the statute— "coerce, intimidate, threaten or interfere"— mean exactly what they say. The fact that the City's behavior is not as severe or egregious as some other cases under § 3617 does not mean that, as a matter of law, what the City did was not violative of this provision. Moreover, if the trier of fact considers that the acts of the City constituted slight or de minimis interference, such a conclusion can be adequately reflected in an appropriate award of damages.

their duties and within the scope of their employment." *Mahone v. Waddle,* 564 F.2d 1018, 1021 (3d Cir.1977).

 Clearly, municipalities are "persons" who can be sued under the Fair Housing Act. *United States v. City of Parma,* 661 F.2d 562, 573 (6th Cir.1981). HUD regulations state:

> "A complaint may also be filed against any person who directs or controls, or has the right to direct or control, the conduct of another person ... if that other person, acting within the scope of his or her authority as employee or agent of the directing or controlling person, is engaged, has engaged, or is about to engage, in a discriminatory housing practice."

24 C.F.R. § 103.20(b). This regulation shows that a municipality can be sued for the acts of its employees, if these acts violated the Fair Housing Act.

Liability for violations of the Act attaches to a principal where its agents violate the Act, even where the principal directs the agent not to discriminate. *See Hamilton v. Svatik,* 779 F.2d 383, 388 (7th Cir.1985); *Marr v. Rife,* 503 F.2d 735, 740–42 (6th Cir.1974). Municipal service providers have also been sued under the Act. *See Southend Neighborhood Improvement Assoc. v. County of St. Clair,* 743 F.2d 1207, 1210 (7th Cir.1984) (County may be sued in its role as manager of residential properties); *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach,* 493 F.2d 799, 802 (5th Cir. 1974) ("The importance of the City's presence as a named party defendant lies in the fact that relief against the City officials may not always provide a complete substitute for relief against the City itself.").

Under the principles elicited above, it is clear under the Fair Housing Act that the City can be held liable for the illegal acts and deeds of its employees, including those of Lt. Carlson, Ms. Wilson, Ms. Wimbish, Councilman Perkins, and Detectives Pherson and Clouse. Under a theory of respondeat superior, whether there was one illegal act by a City official or a hundred such acts is of no import.

## III.  CONCLUSION

Pursuant to Fed.R.Civ.P. 56 and for the reasons stated above, the City's Motion for Summary Judgment is DENIED.