UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT


Nos. 95-1950
95-1951
95-1952

JANET SCOTT-HARRIS,
Plaintiff, Appellee,

v.

CITY OF FALL RIVER, ET AL.,
Defendants, Appellants.


No. 95-2100

JANET SCOTT-HARRIS,
Plaintiff, Appellant,

v.

CITY OF FALL RIVER, ET AL.,
Defendants, Appellees.


APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge] 


Before

Selya, Circuit Judge, 
Aldrich, Senior Circuit Judge, 
and Boudin, Circuit Judge. 


Harvey A. Schwartz, with whom Schwartz, Shaw & Griffith was 
on brief, for plaintiff.
Stephen C. Fulton, with whom Law Office of Bruce R. Fox was 
on brief, for defendant City of Fall River.
Bruce A. Assad for defendant Marilyn Roderick. 
Robert J. Marchand, with whom Driscoll, Marchand, Boyer & 
Stanton and Mary E. O'Neil were on brief, for defendant Daniel 
Bogan.


January 15, 1997


SELYA, Circuit Judge. Although America began with the SELYA, Circuit Judge. 

vision of a city on a hill, not every American has shared a sense

of optimism about our nation's municipalities. Indeed, one of

the most illustrious of the Framers regarded great cities as

"pestilential to the morals, the health, [and] the liberties of

man." Christopher Tunnard, The City of Man 34 (1970) (quoting 

Thomas Jefferson).

In this vein, American legal institutions have begun

over time to view cities with a certain constitutionally based

suspicion. Thus, in Monell v. New York City Dep't of Social 

Servs., 436 U.S. 658, 691 (1978), the Supreme Court ruled that 

municipalities could be held liable under 42 U.S.C. 1983 for

deprivations of federally protected rights which occurred

"pursuant to official municipal policy of some nature."1 Monell 

opened the floodgates for an outpouring of such suits against

municipalities.

 

1The statute provides:

Every person who, under color of any statute,
ordinance, regulation, custom, or usage, of
any State . . ., subjects, or causes to be
subjected, any citizen of the United States
or other person within the jurisdiction
thereof to the deprivation of any rights,
privileges, or immunities secured by the
Constitution and laws, shall be liable to the
party injured in an action at law, suit in
equity, or other proper proceeding for
redress.

42 U.S.C. 1983 (1994). The upshot of the Monell decision is 
that a municipality is a "person" for purposes of section 1983,
and, hence, amenable to suit for violations thereof. See Monell, 
436 U.S. at 690.

2

The case at hand is one example of the genre. At

trial, a jury found the City of Fall River (the City) and two

municipal officials liable under section 1983 for the passage of

a facially neutral ordinance that abolished the plaintiff's job.

The defendants' appeals raise a tantalizing question about

whether a discriminatory animus displayed by fewer than the

minimum number of city council members whose votes would be

required to enact an ordinance can (or should) be imputed to the

municipality itself. Other interesting questions abound,

including questions dealing with causation in the context of

constitutional torts and the availability of legislative immunity

defenses in that setting. Before addressing any of these issues,

however, we must parse Fed. R. App. P. 4 (a)(6) for the first

time and determine whether the defendants have brought their

appeals in a timeous fashion.

I. A TALE OF ONE CITY I. A TALE OF ONE CITY

Many of the facts in this case are conflicted. We

present them as best they have presented themselves, occasionally

resolving disparities as the jury permissibly might have done.

See, e.g., Veranda Beach Club Ltd. Partnership v. Western Sur. 

Co., 936 F.2d 1364, 1375 (1st Cir. 1991) (discussing standard for 

appellate review of post-verdict challenges to evidentiary

sufficiency).

The City hired the plaintiff, Janet Scott-Harris, as

the administrator of the newly created Department of Health and

Human Services (HHS). When Scott-Harris entered the City's

3

service in 1987, she became the first African-American ever to

hold a managerial position in the municipal government. By all

accounts she performed quite well at HHS. Withal, she did not

enjoy a problem-free relationship with the City's political

hierarchs. In 1988, for example, she clashed with Marilyn

Roderick, the vice-president of the City Council. Scott-Harris

believed that Roderick made inappropriate references to an

aspirant's ethnicity in the course of an employment interview and

stormed out of the room. Shortly thereafter, she engaged in a

shouting match with Roderick. When Scott-Harris subsequently

attempted to apologize, Roderick hung up the telephone.

Scott-Harris' difficulties with Roderick did not end

with the aforedescribed incident. There were periodic flare-ups

by way of illustration, Roderick wrote a letter to the City

Administrator, Robert Connors, protesting Scott-Harris' use of a

City-owned motor vehicle but it was Scott-Harris' reaction to

the dysphemisms spouted by Dorothy (Dot) Biltcliffe, a nutrition

program assistant for the City's Council on Aging (COA), that

precipitated internecine warfare. In the fall of 1990, Scott-

Harris learned that Biltcliffe had been making offensive

comments. In one instance, referring to her co-worker Paula

Gousie and to Scott-Harris, Biltcliffe remarked: "That little

French bitch has her head up that nigger's ass." In another,

Biltcliffe referred to a secretary as "a little black bitch."

Scott-Harris spoke out against this racist invective and, because

COA operated under her general supervision, she consulted with

4

Connors and then drew up a set of charges against Biltcliffe as a

prelude to dismissal.

The pendency of these charges did not improve

Biltcliffe's manners; she called Scott-Harris "a black nigger

bitch" and warned that there would be repercussions because

Biltcliffe "knew people." Biltcliffe unabashedly pressed her

case with two city councilors (Roderick and Raymond Mitchell) and

a state senator who, in turn, called Roderick. After numerous

postponements the City held a hearing on March 27, 1991. This

resulted in a settlement under which Biltcliffe agreed to accept

a 60-day suspension without pay. Mayor Daniel Bogan subsequently

intervened and pared the punishment substantially.

During this time frame the City's financial outlook

worsened. Municipal officials anticipated that state aid would

decline up to 10% in the next fiscal year (July 1, 1991 to June

30, 1992). Mayor Bogan directed Connors to prepare a list of

proposed budget cuts to accommodate the anticipated reduction in

funding. Connors asked his department heads, including Scott-

Harris, for their input. Scott-Harris recommended reducing the

hours of school nurses. Bogan rejected this suggestion and, over

Connors' objection, insisted that Scott-Harris' position be

eliminated.

Because the post had been created by municipal

ordinance, its abolition necessitated the same procedural

formalities. The City Charter requires the votes of a majority

of the nine members of the City Council for passage of such an

5

ordinance. The mayor often submits proposed legislation to the

City Council, and, in addition, he must approve every enacted

ordinance (or else the Council must override his veto). In

February 1991 Bogan asked the Council to do away with Scott-

Harris' position. On March 5 the ordinance committee, chaired by

Roderick, reported out an emendatory ordinance designed to

achieve this end and recommended its passage. Three weeks later

the City Council voted six-to-two (Roderick voting with the

majority) to approve the position-elimination ordinance. Bogan

signed it into law.

At about the same time that he moved to incinerate

Scott-Harris' job, Bogan offered her a different portfolio 

Public Health Director which paid approximately $12,000 less

per annum. Scott-Harris accepted the offer by letter dated

February 28, 1991, but a follow-up communiqu from Bogan added

extra duties and shifted Scott-Harris to a less desirable office.

Disappointed, Scott-Harris drafted a letter rejecting the job

offer. That letter mysteriously arrived at the mayor's office

and was acted upon by Bogan despite Scott-Harris' efforts to

retract it. Scott-Harris' tour of duty with the City ended on

March 29, 1991 two days after the hearing that led to

Biltcliffe's suspension. She filed suit several months later.

II. THE LITIGATION II. THE LITIGATION

Solon, the fabled Greek legislator, once characterized

the best type of city as one "in which those who are not wronged,

no less than those who are wronged, exert themselves to punish

6

the wrongdoers." Plutarch, Plutarch's Lives 455 (Bernadotte 

Perrin trans., 1914). Here, the plaintiff's complaint alleged in

substance that the City and certain municipal officials2 inverted

the Solonic ideal: when the plaintiff responded forcefully (but

appropriately) to Biltcliffe's racial slurs, the defendants sided

with the wrongdoer and instead punished Scott-Harris by ousting

her from her position under a blatant pretext. The plaintiff

alleged that, in so doing, the defendants abridged her First

Amendment rights and set the stage for redress under section

1983. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 

U.S. 274, 287 (1977) (explaining that in order to prevail on a

section 1983 claim based on the First Amendment, the plaintiff

must prove that her protected speech was a substantial or

motivating factor in the decision to eliminate her job).

At trial the defendants asserted that their motives in

passing the challenged ordinance were exclusively fiscal. The

plaintiff disagreed, contending that racial animus and a desire

to punish her for protected speech, not budgetary constraints,

spurred the introduction and passage of the ordinance. On May

26, 1994, evidently persuaded by the plaintiff's efforts to

connect Dot to her dismissal, the jury returned a verdict against

 

2The plaintiff originally sued a plethora of defendants.
She quickly narrowed the field to Connors, Roderick, Bogan, and
the City. During the ensuing trial, the judge directed a verdict
in Connors' favor. The plaintiff has not contested that ruling,
and we discuss these appeals as if Bogan, Roderick, and the City
were the sole defendants.

7

all three defendants.3

The verdict form memorialized the jury's conclusions

(1) that the plaintiff's constitutionally protected speech was a

substantial or motivating factor both in Bogan's decision to

recommend enactment of the ordinance and in Roderick's decision

to work for its passage, and (2) that these actions proximately

caused the extirpation of the HHS director's position. As

originally returned, the verdict form added an inconvenient

wrinkle; it indicated that the plaintiff had not proven that the

City's professed desire to enact the ordinance for budgetary

reasons was pretextual. Out of the jury's earshot, the judge

expressed her concern that the jury's findings were internally

inconsistent. After a brief colloquy, she resubmitted the case

to the jury with appropriate supplemental instructions. Shortly

thereafter the jury returned a revised verdict form which

reiterated everything except the "no pretext" finding. In that

wise, the jury, having reconsidered the matter, now concluded

that the City's stated reason for wanting the ordinance 

budgetary concerns was not its true reason.

The jury assessed compensatory damages against all

three defendants, jointly and severally, in the amount of

$156,000; found Bogan liable for punitive damages in the amount

of $60,000; and found Roderick liable for punitive damages in the

 

3The jury found against the plaintiff on her race
discrimination claim, and she does not contest that finding here.

8

amount of $15,000.4 The court subsequently denied the

defendants' motions for judgment notwithstanding the verdict.

These appeals followed but not without a perturbing procedural

prelude.

III. THE NOTICES OF APPEAL III. THE NOTICES OF APPEAL

Rule 4(a)(1) of the Federal Rules of Appellate

Procedure requires that notices of appeal "be filed with the

clerk of the district court within 30 days after the date of

entry of the judgment or order appealed from." Compliance with

this rule is mandatory and jurisdictional; while a court may

construe the rule's strictures liberally, it may not wink at

them. See Torres v. Oakland Scavenger Co., 487 U.S. 312, 315 

(1988); Air Line Pilots Ass'n v. Precision Valley Aviation, Inc., 

26 F.3d 220, 223 (1st Cir. 1994).

In this instance the district court entered the

appealable order the order denying the defendants' post-trial

motions for judgment n.o.v. on January 30, 1995. The

defendants did not file their notices of appeal until August of

that year. Without more, Rule 4(a)(1) would bar the maintenance

of these appeals.

The appeal period denominated by Rule 4(a)(1) is,

 

4Although punitive damages may lie against individuals in a
section 1983 action, see, e.g., Keenan v. City of Philadelphia, 
983 F.2d 459, 469-70 (3d Cir. 1992); Davet v. Maccarone, 973 F.2d 
22, 27 (1st Cir. 1992), they are not available against a
municipality. See City of Newport v. Fact Concerts, Inc., 453 
U.S. 247, 271 (1981).

9

however, subject to an occasional exception. One such exception,

added to the Appellate Rules in 1991, provides:

The district court, if it finds (a) that a
party entitled to notice of the entry of a
judgment or order did not receive such notice
from the clerk or any party within 21 days of
its entry and (b) that no party would be
prejudiced, may, upon motion filed within 180
days of entry of the judgment or order or
within 7 days of receipt of such notice,
whichever is earlier, reopen the time for
appeal for a period of 14 days from the date
of the entry of the order reopening the time
for appeal.

Fed. R. App. P. 4(a)(6). The mention of "notice" in Rule 4(a)(6)

is a reference to Fed. R. Civ. P. 77(d), which provides:

Immediately upon the entry of an order or
judgment the clerk shall serve a notice of
entry by mail in the manner provided for in
Rule 5 upon each party who is not in default
for failure to appear, and shall make a note
in the docket of the mailing. Any party may
in addition serve a notice of such entry in
the manner provided in Rule 5 for the service
of papers. Lack of notice of the entry by
the clerk does not affect the time to appeal
or relieve or authorize the court to relieve
a party for failure to appeal within the time
allowed, except as permitted in Rule 4(a) of
the Federal Rules of Appellate Procedure.

These rules lie at the center of the jurisdictional

jumble that confronts us. On the defendants' motions, the

district court held a hearing and determined that Fed. R. App. P.

4(a)(6) appropriately could be invoked to excuse the defendants'

seeming tardiness. The plaintiff's cross-appeal challenges this

determination. Because Rule 4(a)(6) is relatively new, we have

not yet had occasion to construe it. We do so today, deciding at

the outset that the standard of review which governs a district's

10

court's determinations under Rule 4(a)(6) is abuse of discretion.

Accord Nunley v. City of Los Angeles, 52 F.3d 792, 794 (9th Cir. 

1995).

Certain elements of the Rule 4(a)(6) calculus are

essentially undisputed: the defendants were parties entitled to

notice of the entry of the appealable final order; their Rule

4(a)(6) motions, filed on April 10 and 11, 1995, came within 180

days of the entry of that order; and no party would be subjected

to cognizable prejudice by the granting of the motions. Thus,

the decisive questions in this case relate to whether the

defendants received notice of the entry of the order within 21

days, and if not, whether they filed their Rule 4(a)(6) motions

within seven days of the time when they eventually received such

notice.

Both of these questions involve an appreciation of the

kind of notice that Rule 4(a)(6) contemplates. In terms, Rule

4(a)(6) advances a unitary concept of notice; its two references

to "such notice" plainly relate back to the phrase "notice of the

entry of a judgment or order." The problem, exemplified by this

case, is that the rule does not specify whether that notice must

be written notice or actual notice. That problem defies facile

solutions, and the courts of appeals which have addressed it thus

far have not achieved consensus. Compare Avolio v. County of 

Suffolk, 29 F.3d 50, 53 (2d Cir. 1994) (holding that the rule 

contemplates written notice) with Nunley, 52 F.3d at 794 (holding 

that actual notice suffices) and Zimmer St. Louis, Inc. v. Zimmer 

11

Co., 32 F.3d 357, 359 (8th Cir. 1994) (same). Though we 

acknowledge that the phrase, simpliciter, is susceptible of 

multiple interpretations, we believe that the references to

"notice" in Rule 4(a)(6), taken in context, are best read as

requiring written notice.

Our starting point is our perception that Appellate

Rule 4(a)(6) and Civil Rule 77(d) must be read in pari passu. 

Accord Nunley, 52 F.3d at 795. The text of Rule 77(d) requires 

the clerk to serve the notice of entry of an order or judgment

"by mail." Because a mailed notice is invariably written, it

seems logical to conclude that when reference is made later in

the text to "lack of notice of the entry," that reference

contemplates lack of written notice. 

We think that further evidence to the same effect can

be gleaned from the scrivenings of the Advisory Committee. The

Advisory Committee's Notes are entitled to weight in interpreting

federal rules of practice and procedure. See Whitehouse v. U.S. 

Dist. Ct. for Dist. of R.I., 53 F.3d 1349, 1364-65 (1st Cir. 

1995). Here, they tell us that Rule 4(a)(6)

provides a limited opportunity for relief in
circumstances where the notice of entry of a
judgment or order, required to be mailed by
the clerk of the district court pursuant to
[Rule 77(d)], is either not received by a
party or is received so late as to impair the
opportunity to file a timely notice of
appeal.

Fed. R. App. P. 4(a)(6), Advisory Committee's Notes. The

statement "required to be mailed" refers to "notice of entry of a

judgment or order," again suggesting that the notice must be in

12

writing. We believe that when a procedural rule uses the precise

phrase employed by the Advisory Committee, it can reasonably be

inferred that the phrase means the same thing in both contexts.

Policy concerns point us in the same direction.

Reading Rule 4(a)(6) to require written notice will simplify

future proceedings. As the familiar request to "put it in

writing" suggests, writings are more readily susceptible to proof

than oral communications. In particular, the receipt of written

notice (or its absence) should be more easily demonstrable than

attempting to discern whether (and, if so, when) a party received

actual notice. Such a scheme not only takes much of the

guesswork out of the equation, but also, because Rule 77(d)

specifically provides that parties who do not wish to rely upon

the clerk to transmit the requisite written notice may do so

themselves, the scheme confers certitude without leaving a

victorious litigant at the mercy of a slipshod clerk.

To sum up, we hold that written notice is required to

trigger the relevant time period under Rule 4(a)(6); oral

communications or other forms of actual notice will not serve.

We now apply this holding to the facts at hand.

The district court found that the defendants did not

receive written notice of the entry of the operative order until

April 7, 1995, when the plaintiff's counsel sent them a demand

letter seeking satisfaction of the judgments. The court made

this finding against a backdrop of unusual events. The

defendants' motions for judgment n.o.v. were argued on September

13

29, 1994. During that session, an unrecorded sidebar conference

occurred. The court's comments at that conference left all

counsel with the distinct impression that an appealable final

judgment would not enter until the court decided the plaintiff's

pending application for attorneys' fees. Although the impression

was mistaken, see Budinich v. Becton Dickinson & Co., 486 U.S. 

196, 202-03 (1988) (holding that the appeal period commences once

a final decision on the merits has been entered, irrespective of

any claim for attorneys' fees), it proved persistent. The

plaintiff's lawyer, no less than defense counsel, labored under

the misimpression; he wrote to the defense team on February 2,

1995, stating in relevant part: "I received the Court's

memorandum and order on the defendants' motion for J.N.O.V. The

only remaining issue before judgment can be entered is the 

plaintiff's unopposed motion for attorney's fees." (Emphasis

supplied).

Unbeknownst to the parties, however, the court had

granted the plaintiff's motion for attorneys' fees in late 1994.

The clerk entered this order on the docket but, apparently,

neglected to serve copies of the order or the docket entry on

counsel. To complicate matters further, when defense counsel

made inquiries to the clerk in February and March of 1995 as to

whether an order had been entered disposing of the fee

application, the clerk said that one had not.

Last but not least, although all counsel in one way or

another had actual notice of the order that denied the

14

defendants' motions for judgment n.o.v. by February 1, 1995,

cases discussing Rule 4(a)(6) differentiate between notice of an

order and notice of the entry of the order, indicating that the

rule contemplates the latter. See Virella-Nieves v. Briggs & 

Stratton Corp., 53 F.3d 451, 452-54 (1st Cir. 1995). In this 

instance the clerk attempted to furnish such notice, but one copy

of the court's order was addressed incorrectly and returned by

the Post Office as undeliverable, while another copy, plucked by

a different lawyer from the clerk's office, bore no notation that

it had been entered on the docket. From this tangled record the

district court concluded that, though at least one defense

attorney received actual notice of the entry of the order on

February 24, 1995,5 it was not until April 7, 1995 when the

plaintiff's attorney demanded satisfaction of the judgments 

that the defendants received a written notice sufficient to

animate Rule 4(a)(6). They filed their excusatory motions within

seven days of their receipt of this notice.

Given these facts, and given the confused circumstances

that contributed to the muddle, the district court did not abuse

its discretion in finding that the requirements of Rule 4(a)(6)

had been met and in reopening the time for appeal. Since the

defendants all filed their notices of appeal within the 14-day

period that began on August 14, 1995, when Judge Saris entered

her order reopening the time for doing so, we conclude that the

 

5We note, parenthetically, that even this notice came after
the 21-day period specified by Rule 4(a)(6) had elapsed.

15

appeals are properly before us.

IV. THE VERDICT FORM IV. THE VERDICT FORM

The defendants collectively assert that the district

court erred in refusing to declare a mistrial when presented with

the original verdict form and added impudence to injury by

resubmitting the case for further deliberation. We review the

district court's denial of the defendants' motions for a mistrial

for abuse of discretion. See Clemente v. Carnicon-P.R. Mgmt. 

Assocs., 52 F.3d 383, 388 (1st Cir. 1995). We evaluate the 

judge's related actions, namely, her decisions to reject the

original verdict form and to resubmit the matter, under the same

standard of review. See Santiago-Negron v. Castro-Davila, 865 

F.2d 431, 444 (1st Cir. 1989).

The defendants' argument on this point boils down to a

claim that the district court crafted a verdict form that was

structurally flawed; that the jury responded to it by returning

two irreconcilable findings; and that, therefore, Judge Saris

should have granted the defendants' motions for a mistrial. But

it is not enough to preserve the defendants' point that, after

the jury first returned with the verdict form, the defendants

pounced on the perceived inconsistency and moved to pass the

case. Rather, the viability of this assignment of error harks

back to the circumstances surrounding the emergence of the

verdict form. Although the defendants now say that the form

tempted potential confusion, they failed to object when the judge

initially submitted it to the jury. The failure to object to the

16

structure of a verdict form before the jury retires, like the

failure to object to any other portion of the judge's charge,

constitutes a waiver. See Fed. R. Civ. P. 51; see also Phav v. 

Trueblood, Inc., 915 F.2d 764, 769 (1st Cir. 1990) (holding that 

Rule 51 applies to verdict forms as well as to the trial court's

oral instructions); Anderson v. Cryovac, Inc., 862 F.2d 910, 918 

(1st Cir. 1988) ("If a slip has been made, the parties

detrimentally affected must act expeditiously to cure it, not lie

in wait and ask for another trial when matters turn out not to

their liking.").

We need not probe this point too profoundly, for in all

events the judge handled the perceived incongruity in an

agreeable manner. When a verdict appears to be internally

inconsistent, the safest course in the absence of irreparable

damage, and none appears here is to defer its acceptance,

consult with counsel, give the jury supplemental instructions,

and recommit the matter for further consideration. See Hafner v. 

Brown, 983 F.2d 570, 575 (4th Cir. 1992) ("If the district judge 

concludes that an inconsistent verdict reflects jury confusion or

uncertainty, he or she has the duty to clarify the law governing

the case and resubmit the verdict for a jury decision."); Poduska 

v. Ward, 895 F.2d 854, 856 (1st Cir. 1990) (deeming it "precisely 

correct" for a judge, faced with an unclear and inconsistent jury

verdict, to provide supplemental instructions and then recommit

the matter to the jury). This is exactly the course of action

that Judge Saris followed. The actual instructions that she

17

gave, first orally and then in a written response to a jury

question, were unimpugnable.6 We discern no error, no

unfairness, and no abuse of discretion either in the judge's

handling of matters related to the verdict form or in her denial

of the defendants' motions for a mistrial.

V. MUNICIPAL LIABILITY V. MUNICIPAL LIABILITY

We turn now to the City's principal assignment of

error. Clearly, a municipality may be held liable under section

1983 for the passage of a single ordinance or piece of

legislation. See, e.g., Pembaur v. City of Cincinnati, 475 U.S. 

469, 480 (1986). Although municipal liability cannot be based on

the doctrine of respondeat superior in this context, see Monell, 

436 U.S. at 691, such liability can flow from a finding that the

city itself has acted through an official decision of its

legislative body.7 Hence, from a purely theoretical standpoint,

nothing prevents a determination that, if the ordinance here in

question which was passed by a majority vote of the Fall River

City Council and approved by the mayor violates the plaintiff's

First Amendment rights, then the City is liable for the violation

 

6Neither Bogan nor Roderick voiced any objection to the
court's supplemental instructions. The lone objection lodged by
the City challenged the judge's interchanging of "real reason"
and "true reason" during her supplemental instructions. The
judge understandably dismissed this objection as nitpicking, and
the City (wisely, in our view) has not resuscitated it on appeal.

7Such a decision can be manifested either through the
enactment of an ordinance or through the adoption of a municipal
policy. See, e.g., Pembaur, 475 U.S. at 479-81; Monell, 436 U.S. 
at 690. Thus, adoption-of-policy cases are pertinent to a survey
of enactment-of-ordinance cases.

18

under section 1983.

We pause at this juncture. We think it is important to

note early on that the defendants have not challenged the

premise, or the district judge's confirmatory ruling, that Scott-

Harris' speech was protected by the First Amendment in the sense

needed to give rise to a claim under section 1983. Yet the

Supreme Court has laid down important restrictions: to give rise

to a section 1983 action, a plaintiff's speech must have been on

a matter of public concern, and her interest in expressing

herself must not be outweighed by the state's interest as

employer in promoting the efficiency of the services that it

performs. See Waters v. Churchill, 114 S. Ct. 1878, 1884 (1994); 

Connick v. Myers, 461 U.S. 138, 142 (1983). 

Given the Supreme Court's application of these tests in

Connick, 461 U.S. at 147-54, one could argue that Scott-Harris' 

comments about, and efforts to discipline, a particular employee

do not qualify as speech on a matter of public concern. We do

not pursue this point because it has not been argued to us; it

has, therefore, effectively been waived. We mention it, however,

because we do not intend our opinion to be taken as deciding that

the facts here asserted comprise protected speech.

We note, moreover, that there is another unusual twist

to this case. In most similar instances, the constitutional

deprivation is apparent on the face of the ordinance or in the

text of the challenged municipal policy, thus eliminating any

need for a predicate inquiry into the motives of individual

19

legislators. See, e.g., City of Oklahoma City v. Tuttle, 471 

U.S. 808, 822-23 (1985); City of Newport v. Fact Concerts, Inc., 

453 U.S. 247, 251-53 (1981); Bateson v. Geisse, 857 F.2d 1300, 

1303 (9th Cir. 1988); Little v. City of N. Miami, 805 F.2d 962, 

967 (11th Cir. 1986); 18A James Perkowitz-Solheim et al.,

McQuillin Mun. Corp. 53.173 (3d ed. 1993). Here, by contrast, 

the City enacted an ordinance which, on its face, is benign. In

cases like this one, implicating the exercise of First Amendment

rights, liability under section 1983 can attach to the passage of

a facially benign law only if one peers beneath the textual

facade and concludes that the legislative body acted out of a

constitutionally impermissible motive. This is a delicate

business, but this court previously has sanctioned an

investigation into the motives that underlay the enactment of a

facially neutral ordinance for the purpose of assessing liability

under section 1983, see Acevedo-Cordero v. Cordero-Santiago, 958 

F.2d 20, 23 (1st Cir. 1992), and we are bound by that precedent.

Still, the accumulated jurisprudence leaves perplexing

problems of proof unanswered. The baseline principle is well-

settled: legislators' bad motives may be proven by either direct

or circumstantial evidence. See, e.g., United States v. City of 

Birmingham, 727 F.2d 560, 564-65 (6th Cir.), cert. denied, 469 

U.S. 821 (1984); Smith v. Town of Clarkton, 682 F.2d 1055, 1064- 

65 (4th Cir. 1982). But this principle speaks to the qualitative 

nature of the evidence that is gathered; it does not address the

quantitative question. That question is best framed as follows: 

20

How many municipal legislators (or, put another way, what

percentage of the legislative body) must be spurred by a

constitutionally impermissible motive before the municipality

itself may be held liable under section 1983 for the adoption of

a facially neutral policy or ordinance? This is a difficult

question, and the case law proves a fickle companion.

Some courts appear to have held that the plaintiff must

adduce evidence sufficient to show that a majority of the members

of the legislative body acted from a constitutionally proscribed

motive before this kind of municipal liability can attach. Often

this position is implied rather than specifically articulated.

See generally United States v. City of Yonkers, 856 F.2d 444, 

457-58 (2d Cir. 1988). But some courts have been more

forthcoming. In Church v. City of Huntsville, 30 F.3d 1332 (11th 

Cir. 1994), a group of homeless persons alleged that the city had

adopted a policy of excluding them from the community. The

plaintiffs based their section 1983 action on the acts and

statements of one individual on a five-member city council. The

court observed that a single council member did not have any

authority either to establish municipal policy or to bind the

municipality. See id. at 1343-44. It therefore examined the 

evidence against the other four councilors, finding that two had

opposed the alleged policy and that two had expressed no views on

the subject. The court refused to draw an inference of

discriminatory intent from the silence of council members, see 

id. at 1344 n.5, and rejected the plaintiffs' claim. 

21

Other courts, acting principally in the areas of race

and gender discrimination, have not required evidence of the

motives of a majority of the legislative body before imposing

liability on the municipality under section 1983. Representative

of this line of cases is United States v. City of Birmingham, 538 

F. Supp. 819 (E.D. Mich. 1982), aff'd, 727 F.2d 560 (6th Cir. 

1984). There, the district court held a city liable for

violations of the Fair Housing Act, 42 U.S.C. 3604(a), 3617

(1994), based on the actions of a seven-member municipal

commission which had blocked the construction of racially-

integrated housing by a four-to-three vote. While opponents of

the project had attributed their position to a series of

articulated nondiscriminatory rationales, the court looked behind

their avowals and ruled, based on a combination of direct and

circumstantial evidence, that racial considerations actually

propelled the commission's action. 538 F. Supp. at 826-27. The

court concluded that the city could be held liable for the

commissioners' animus even though there was no proof of the

motives of all four commissioners who voted to kill the project;

it was enough, the court suggested, if "racial considerations

were a motivating factor among a significant percentage of those

who were responsible for the city's [rejection of the project]."

Id. at 828. Explicating this construct, the court indicated that 

a "significant percentage" would not have to encompass the entire

four-person majority. See id. at 828-29. Noting evidence that 

racial concerns motivated "at least two of the four members of

22

the majority faction," the court declared that "[t]hat fact alone

may be sufficient to attribute a racially discriminatory intent

to the City." Id. at 829.8 

Two Massachusetts cases also premise municipal

liability on evidence concerning less than a majority of the

relevant legislative body. In Southern Worcester County Regional 

Voc. Sch. Dist. v. Labor Relations Comm'n, 436 N.E.2d 380 (Mass. 

1982), the Supreme Judicial Court (SJC) upheld a lower court's

finding that the plaintiffs had been discharged based on their

union activity. The SJC declared that "it is not fatal to the

[plaintiffs'] claims that only three of the seven members of the

school committee made anti-union statements." Id. at 385. The 

court concluded that the three members' statements, coupled with

evidence of bias on the part of the school superintendent (who

had no vote), sufficed to support the finding of liability. See 

id. Similarly, in Northeast Metro. Regional Voc. Sch. Dist. Sch. 

Comm. v. MCAD, 575 N.E.2d 77 (Mass. App. 1991), a gender 

discrimination case involving a refusal to hire, the court noted

that direct evidence of bias had been exhibited by only two of

the twelve members of the school committee. See id. at 81. The 

 

8This rationale finds succor in United States v. Yonkers Bd. 
of Educ., 837 F.2d 1181, 1221-23 (2d Cir. 1987), cert. denied, 
486 U.S. 1055 (1988), in which the court of appeals held the city
liable for Fair Housing Act violations. Though the city's
liability derived from the actions of a 12-member city council,
the court focused almost exclusively on statements by the mayor
(who had only one vote on the council) and race-based opposition
expressed by a few other councilors. The court did not premise
its decision on a requirement that a majority of the council had
acted out of impermissible motives.

23

court upheld a finding of liability based on this evidence and on

statements by three other committee members that the plaintiff

had been a victim of discrimination and/or had been the best

qualified candidate for the job. See id. at 81-82. 

The precedent in this area is uncertain, and persuasive

arguments can be made on both sides. On the one hand, because a

municipal ordinance can become law only by a majority vote of the

city council, there is a certain incongruity in allowing fewer

than a majority of the council members to subject the city to

liability under section 1983. On the other hand, because

discriminatory animus is insidious and a clever pretext can be

hard to unmask, the law sometimes constructs procedural devices

to ease a victim's burden of proof. See, e.g., McDonnell-Douglas 

Corp. v. Green, 411 U.S. 792, 802-05 (1973) (establishing 

presumptions for use in Title VII cases); Mesnick v. General 

Elec. Co., 950 F.2d 816, 823-24 (1st Cir. 1991) (adopting 

comparable format for age discrimination cases), cert. denied, 

504 U.S. 985 (1992). Where, as here, a plaintiff alleges that a

city's councilors connived to victimize her by the pretextual

passage of a facially neutral ordinance, it may be overly

mechanistic to hold her to strict proof of the subjective

intentions of a numerical majority of council members.

Cognizant of these competing concerns, we eschew for

the time being a bright-line rule. Rather, we assume for

argument's sake (but do not decide) that in a sufficiently

compelling case the requirement that the plaintiff prove bad

24

motive on the part of a majority of the members of the

legislative body might be relaxed and a proxy accepted instead.

Nevertheless, any such relaxation would be contingent on the

plaintiff mustering evidence of both (a) bad motive on the part

of at least a significant bloc of legislators, and (b)

circumstances suggesting the probable complicity of others. By

way of illustration, evidence of procedural anomalies, acquiesced

in by a majority of the legislative body, may support such an

inference. See, e.g., City of Birmingham, 727 F.2d at 564-65; 

Town of Clarkton, 682 F.2d at 1066-67. By like token, evidence 

indicating that the legislators bowed to an impermissible

community animus, most commonly manifested by an unusual level of

constituent pressure, may warrant such an inference. See, e.g., 

United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1221-25 (2d 

Cir. 1987), cert. denied, 486 U.S. 1055 (1988); City of 

Birmingham, 538 F. Supp. at 824-27. The key is likelihood: Has 

the plaintiff proffered evidence, direct or circumstantial,

which, when reasonable inferences are drawn in her favor, makes

it appear more probable (i.e., more likely than not) that

discrimination was the real reason underlying the enactment of

the ordinance or the adoption of the policy?

The facts of this case do not require that we refine

the point to any further extent. Scott-Harris has not only

failed to prove that a majority of the councilors possessed a bad

motive, but she also has failed to furnish enough circumstantial

evidence to ground a finding that, more likely than not, a

25

discriminatory animus propelled the City Council's action.

The evidence, viewed most hospitably to the plaintiff,9

reveals that six of the nine councilors voted in favor of the

challenged ordinance and two opposed it. The plaintiff presented

sufficient evidence from which a jury could deduce that one of

these six, Roderick, along with Mayor Bogan (who did not have a

vote), acted out of a bad motive.10 The plaintiff also produced

some glancing evidence apropos of Councilor Mitchell: he and

Roderick were friends; Roderick spoke to him about the

Biltcliffe/Scott-Harris imbroglio; and Biltcliffe called him,

presumably to protest her treatment. The jury could have found

from other evidence in the case that Mitchell probably voted in

favor of the ordinance (although the record does not eliminate

the possibility that he abstained). Even though Mitchell did not

testify and the substance of his conversations with Roderick and

Biltcliffe are unknown, we assume arguendo that a jury reasonably

could infer that Mitchell, too, acted for a proscribed reason.

The remaining gaps in the plaintiff's proof are

 

9On the question of evidentiary sufficiency, we review de
novo the denial of the City's motion for judgment n.o.v. Gibson 
v. City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994). We are 
bound by the same decisional standards that bound the court
below: we must evaluate the record without regard to witness
credibility, testimonial conflicts, or unevenness in the weight
of the evidence, see id., and we must affirm unless, after 
surveying the evidence and the inferences derivable therefrom in
the light most flattering to the plaintiff, we determine that a
rational factfinder could not have resolved liability in her
favor, see Veranda Beach Club, 936 F.2d at 1375. 

10We discuss the evidence against Roderick and Bogan in Part
VI(C), infra. 

26

considerably more difficult to overlook. None of the other seven

city council members uttered any untoward statements or engaged

in any suspicious actions. The "we must slash the budget"

pretext had a ring of plausibility, and from aught that appears,

none of these seven individuals had any way of knowing that the

position-elimination ordinance would not save the City sorely

needed funds. Nor is there strong circumstantial evidence of

complicity; indeed, the record tells us almost nothing about the

inclinations of the silent seven.11 Moreover, the plaintiff made

virtually no effort to adduce such evidence. She neither deposed

any of the seven nor called them as witnesses at trial. She did

not attempt to show that any of the other four councilors who

voted for the ordinance had any basis for doubting the truth of

the party line ("we must slash the budget") or that they

possessed ties to Roderick or Bogan, or that they were beholden

to Biltcliffe, or that they were hostile to Scott-Harris. The

stark fact is that the motivations of the council members other

than Roderick and Mitchell did not receive individualized

scrutiny. By any responsible standard, this sparse evidence

falls short of providing a proper predicate for a finding of

municipal liability.

We do not think it is a coincidence that in every

 

11The record does show that one council member who voted
against the ordinance, John Medeiros, called the plaintiff and
asked why "they" were trying to get rid of her. But the
plaintiff provided no insight into who "they" might be and no
evidence that "they" comprised a majority, or even a significant
bloc, of the City Council.

27

analogous case in which municipal liability has been imposed on

evidence implicating less than a majority of a legislative body,

substantial circumstantial evidence existed from which the

requisite discriminatory animus could be inferred. In City of 

Birmingham, the evidence showed that the race-based opposition of 

constituents to integrated housing was widespread, pronounced,

and vociferously articulated. After several members who

supported the racially integrated development were ousted from

office, the commission responded to this unremitting pressure and

took the unprecedented step of submitting the proposal to a

community referendum. 538 F. Supp. at 826-29. In Yonkers Bd. of 

Educ., the requisite inference was supported by evidence of 

massive constituent agitation as well as by "departures from the

normal procedural sequence" in respect to the challenged

proposal. 837 F.2d at 1221. 

In this case no such evidence exists. Nothing suggests

the City Council deviated from its standard protocol when it

received and enacted the ordinance that abolished the plaintiff's

job. Nothing suggests that the vote took place in an atmosphere

permeated by widespread constituent pressure.12 Putting

speculation and surmise to one side, it simply cannot be inferred

that more than two of the council members who voted to abolish

 

12The plaintiff's assertion that the publication of front-
page articles about her plight in the local newspaper shows
constituent coercion will not wash. There is a significant
difference between heightened public interest an environmental
phenomenon with which legislatures grapple constantly and
pervasive constituent pressure.

28

the plaintiff's position did so to punish her for protected

speech. We cannot rest municipal liability on so frail a

foundation. Because no reasonable jury could find against the

City on the proof presented, Fall River's motion for judgment as

a matter of law should have been granted.

VI. INDIVIDUAL LIABILITY VI. INDIVIDUAL LIABILITY

Roderick and Bogan advance a different constellation of

arguments in support of their motions for judgment n.o.v. We

treat these arguments sequentially.

A. Legislative Immunity. A. Legislative Immunity. 

The individual defendants concentrate most of their

fire on the district court's rendition of the doctrine of

legislative immunity. While municipalities do not enjoy immunity

from suit under section 1983, see Leatherman v. Tarrant County 

Narcotics Intell. & Coord. Unit, 507 U.S. 163, 166 (1993), 

lawmakers have absolute immunity from civil liability for damages

arising out of their performance of legitimate legislative

activities. See Tenney v. Brandhove, 341 U.S. 367, 376 (1951); 

National Ass'n of Social Workers v. Harwood, 69 F.3d 622, 629-30 

(1st Cir. 1995). This immunity derives from federal common law

and, under existing Supreme Court precedents, embraces state

lawmakers, see Tenney, 341 U.S. at 376, and regional officials, 

see Lake Country Estates, Inc. v. Tahoe Regional Plan. Agency, 

440 U.S. 391, 405 (1979).13
 

13Members of Congress enjoy a parallel immunity from
liability for their legislative acts under the Speech or Debate
Clause, U.S. Const. art. I, 6, cl. 1. See Doe v. McMillan, 412 

29

The Court has yet to decide whether local legislators

are protected by this strain of absolute immunity, see Lake 

Country Estates, 440 U.S. at 404 n.26 (reserving the question), 

but the lower federal courts, including this court, have shown no

reticence in holding that the doctrine of legislative immunity is

available to such persons. See, e.g., Acevedo-Cordero, 958 F.2d 

at 22-23; Aitchison v. Raffiani, 708 F.2d 96, 98-100 (3d Cir. 

1983); Reed v. Village of Shorewood, 704 F.2d 943, 952-53 (7th 

Cir. 1983); Bruce v. Riddle, 631 F.2d 272, 274-80 (4th Cir. 

1980). We reaffirm today that the shield of legislative immunity

lies within reach of city officials.

This holding does not end our inquiry. Although

legislative immunity is absolute within certain limits,

legislators are not immune with respect to all actions that they

take. The dividing line is drawn along a functional axis that

distinguishes between legislative and administrative acts. The

former are protected, the latter are not. See Acevedo-Cordero, 

958F.2d at 23. We have useda pair of testsfor separating the two:

The first test focuses on the nature of the
facts used to reach the given decision. If
the underlying facts on which the decision is
based are "legislative facts," such as
"generalizations concerning a policy or state
of affairs," then the decision is
legislative. If the facts used in the
decision making are more specific, such as
those that relate to particular individuals
or situations, then the decision is
administrative. The second test focuses on
"the particularity of the impact of the state
of action." If the action involves
 

U.S. 306, 324 (1973); Harwood, 69 F.3d at 629. 

30

establishment of a general policy, it is
legislative; if the action "single[s] out
specifiable individuals and affect[s] them
differently from others," it is
administrative.

Cutting v. Muzzey, 724 F.2d 259, 261 (1st Cir. 1984) (citations 

omitted).

When the relevant facts are uncontroverted and

sufficiently developed, the question whether an act is

"administrative" as opposed to "legislative" is a question of

law, and it may be decided by the judge on a pretrial motion.

See Acevedo-Cordero, 958 F.2d at 23. When the material facts are 

genuinely disputed, however, the question is properly treated as

a question of fact, and its disposition must await the trial.

See id. 

In some ways, Acevedo-Cordero and this case are fair 

congeners. There, as here, the defendants asserted that

budgetary woes sparked the enactment of a facially benign

position-elimination ordinance. There, as here, the plaintiff(s)

countered with a charge that, in fact, a constitutionally

proscribed reason lurked beneath the surface. There, as here,

conflicted evidence as to the defendants' true motives raised

genuine issues of material fact. Acevedo-Cordero teaches that in 

such situations the issue of immunity must be reserved for the

trial. See id. 

Judge Saris faithfully applied these teachings,

refusing to reward premature attempts by the individual

defendants to dismiss the action on the basis of legislative

31

immunity. At the end of the trial, the jury made two crucial

findings. First, it found that the defendants' stated reason for

enacting the position-elimination ordinance was not their real

reason. Second, it found that the plaintiff's constitutionally

sheltered speech was a substantial or motivating factor in the

actions which Roderick and Bogan took vis- -vis the ordinance.

These findings reflect the jury's belief that the individual

defendants relied on facts relating to a particular individual 

Scott-Harris in the decisionmaking calculus and devised an

ordinance that targeted Scott-Harris and treated her differently

from other managers employed by the City.

We think that in passing on the individual defendants'

post-trial motions, the judge in effect accepted these findings

and concluded that the position-elimination ordinance (which,

after all, constituted no more in this case than the means

employed by Scott-Harris' antagonists to fire her) constituted an

administrative rather than a legislative act. As long as the

quantum of proof suffices a matter to which we shall return 

both this conclusion and its natural corollary (that Roderick and

Bogan are not shielded from liability by operation of the

doctrine of legislative immunity) rest on solid legal ground.14

See, e.g., Negron-Gaztambide v. Hernandez-Torres, 35 F.3d 25, 27- 

 

14The defendants do not assert a claim of qualified
immunity, nor would such a claim be fruitful here. It was
clearly established at the time of the plaintiff's ouster that
public officials could not constitutionally punish a public
employee for protected speech. See Mt. Healthy, 429 U.S. at 283- 
84.

32

28 (1st Cir. 1994), cert. denied, 115 S. Ct. 1098 (1995); Vacca 

v. Barletta, 933 F.2d 31, 33 (1st Cir.), cert. denied, 502 U.S. 

866 (1991).

B. Causation. B. Causation. 

Roderick has another string to her bow. She posits

that, as a matter of law, her actions in respect to the position-

elimination ordinance cannot be deemed the proximate cause of the

harm to Scott-Harris.15 She bases this claim on the fact that

her vote alone was impuissant: five votes would ensure enactment

of the ordinance, but six legislators voted for passage. Thus,

not only was she unable to get the ordinance enacted by herself,

but it also would have been passed without her cooperation. This

thesis has a patina of plausibility, but it misstates the

question before us (and, consequently, we take no view of it).

According to accepted lore, section 1983 actions are to

be considered against the background of traditional tort

principles. See Monroe v. Pape, 365 U.S. 167, 187 (1961); 

Wagenmann v. Adams, 829 F.2d 196, 212 (1st Cir. 1987). In tort 

law, determinations relating to causation are customarily

"question[s] of fact for the jury, to be solved by the exercise

 

15Bogan does not press a comparable claim, probably because,
as he concedes in his brief, the plaintiff's ouster required two
distinct steps: (1) the mayor's proposal of the ordinance, and
(2) a favorable vote by a majority of the city council. Although
both events were necessary, Bogan's actions could properly be
considered a proximate cause of the ultimate harm. See Wagenmann 
v. Adams, 829 F.2d 196, 212 (1st Cir. 1987) (upholding a jury 
finding that a police officer's characterization of plaintiff's
conduct was a proximate cause of excessive bail, even though a
judicial officer was responsible for the ultimate bail decision).

33

of good common sense in the consideration of the evidence of each

particular case." Springer v. Seamen, 821 F.2d 871, 876 (1st 

Cir. 1987) (citations omitted). Phrased another way,

"[a]pplication of the legal cause standard to the circumstances

of a particular case is a function ordinarily performed by, and

peculiarly within the competence of, the factfinder." Swift v. 

United States, 866 F.2d 507, 510 (1st Cir. 1989). 

In this instance, the judge charged the jury as

follows:

The defendant's actions are the legal cause
of the plaintiff's injuries if [they were] a
substantial factor in bringing about the
harm. . . . It does not matter whether other
concurrent causes contributed to the
plaintiff's injuries so long as you find that
the defendant's actions were a substantial
factor in producing them. If defendant's
actions were a substantial factor, then they
were the legal cause or what we call the
proximate cause.

Because no one objected to these instructions, they, whether or

not entirely accurate, are the law of the case.16 See Moore v. 

Murphy, 47 F.3d 8, 11 (1st Cir. 1995); Milone v. Moceri Family, 

Inc., 847 F.2d 35, 38-39 (1st Cir. 1988). 

We believe that the jury, applying this standard to the

facts before it, could reasonably have concluded that Roderick's

overall conduct was a substantial factor in depriving the
 

16We do not mean to suggest that the particular instructions
given here are problematic. To the contrary, they appear at
first blush to comport with precedent. See Furtado v. Bishop, 
604 F.2d 80, 89 (1st Cir. 1979) (discussing causation in the
context of section 1983), cert. denied, 444 U.S. 1035 (1980); see 
also O'Brien v. Papa Gino's of Am., Inc., 780 F.2d 1067, 1072 
(1st Cir. 1986).

34

plaintiff of her constitutional rights. After all, Roderick was

not just another face in the crowd: she served as vice-president

of the City Council and chaired its ordinance committee; as a

result, the jury easily could find that she played a role in the

passage of the ordinance that was disproportionate to her single

vote. In order to gain approval, the ordinance had to go through

the five-member ordinance committee. Roderick established this

committee's agenda, and its favorable report on March 5 cleared

the way for the ordinance's enactment.17

Although the plaintiff's evidence in this regard is not

robust, it suffices in the context of the record as a whole to

render the issue of causation susceptible to differing evaluative

determinations. Thus, the district judge did not err in

submitting the causation question to the jury. And because the

jury reasonably could have adopted one such view of the evidence

and concluded that Roderick made a successful effort to have the

plaintiff ousted, the liability finding must stand.

C. Sufficiency of the Evidence. C. Sufficiency of the Evidence. 

Roderick and Bogan, in chorus, assert that insufficient

evidence exists from which a jury lawfully could find that the

 

17The fact that other causes (i.e., the votes of fellow
council members) concurrently contributed to the harm neither
insulates Roderick's conduct nor undercuts the jury's verdict.
See Ricketts v. City of Columbia, 36 F.3d 775, 779 (8th Cir. 
1994), cert. denied, 115 S. Ct. 1838 (1995); Wagenmann, 829 F.2d 
at 211-13; see generally Marshall v. Perez Arzuaga, 828 F.2d 845, 
848 (1st Cir. 1987) (stating that a "defendant is liable if his
negligence is a proximate cause of the damage although it might
not be the sole proximate cause of such damage") (emphasis in 
original; citations omitted), cert. denied, 484 U.S. 1065 (1988). 

35

desire to punish the plaintiff for her protected speech was a

substantial or motivating factor behind the actions which they

took. This assertion is easily refuted.

In challenging a jury verdict on sufficiency grounds, a

defendant labors under a heavy burden. See supra note 9 

(elucidating applicable legal standard and citing cases).

Because the evidence in this case is capable of supporting two

sets of divergent inferences, Roderick and Bogan cannot carry

their burden.

We choose not to tarry. It suffices to say that, on

this pleochroic record, the jury could have found that Biltcliffe

used political connections to hinder the investigation of Scott-

Harris' accusations by, inter alia, banishing the accuser, and 

that Roderick and Bogan were the instruments of her vengeance.

Roderick bore an animosity toward Scott-Harris based on a history

of friction between the two women, and the jury permissibly could

have found that when Biltcliffe complained to her about Scott-

Harris' charges, she spoke to Connors; that when Scott-Harris

persisted, Roderick agreed to push the position-elimination

ordinance despite the fact that Scott-Harris was performing her

duties well; that the asserted budgetary basis for the ordinance

was a sham;18 and that Roderick knew as much.

As to Bogan, much of the same evidence is relevant. In
 

18On this point, the evidence permitted the jury to conclude
that, rather than saving money, the position-elimination
ordinance actually cost more because it necessitated the hiring
of three new administrators to manage agencies that the plaintiff
had been supervising single-handed.

36

addition, the jury could have found that he knew Biltcliffe and

resented Scott-Harris' outspoken efforts to cashier her; that he

abetted the effort to save Biltcliffe's sinecure by terminating

Scott-Harris (and no other manager) for a bogus reason; that he

proposed the position-elimination ordinance to that end,

notwithstanding Connors' opposition; that he happily signed it

into law; that when he learned of Scott-Harris' intention to

accept a different municipal position at a reduced salary, he

pulled the rug from under her by increasing the responsibilities

of the job and shifting her to a dingy office; that when Scott-

Harris tried to retract her rejection of this diminished

position, he foiled her efforts to do so; and that in all events

Bogan showed his true colors by shortening Biltcliffe's

suspension.

To be sure, this set of conclusions does not flow

ineluctably from the evidence, but it represents a permissible

construction of the record. Consequently, the evidence is

adequate to support the verdicts against both Roderick and Bogan.

VII. ATTORNEYS' FEES VII. ATTORNEYS' FEES

Our journey is not yet ended. The last leg requires us

to revisit the lower court's order awarding the plaintiff

$83,179.70 in counsel fees and associated expenses against three

defendants (Roderick, Bogan, and the City), jointly and

severally.

In a section 1983 action a court, "in its discretion,

may allow the prevailing party . . . a reasonable attorney's fee

37

as part of the costs." 42 U.S.C. 1988 (1994). Despite its

seemingly precatory tone, we have interpreted this language to

mean that "a prevailing plaintiff is presumptively entitled to

fee-shifting" in a section 1983 case. Casa Marie Hogar 

Geriatrico, Inc. v. Rivera-Santos, 38 F.3d 615, 618 (1st Cir. 

1994); accord Foster v. Mydas Assocs., Inc., 943 F.2d 139, 145 

(1st Cir. 1991) (stating that a prevailing civil rights

plaintiff's entitlement to a fee award "comes almost as a matter

of course"). For this purpose, a party prevails if she succeeds

on a significant issue in the litigation and thereby achieves all

or some meaningful part of the benefit that she envisioned when

she brought suit. See Hensley v. Eckerhart, 461 U.S. 424, 433 

(1983); Pearson v. Fair, 980 F.2d 37, 43 (1st Cir. 1992). The 

converse, of course, is equally true: if a plaintiff's claims

against a particular defendant come to naught, she is not a

prevailing party and is not entitled to reap a harvest under

section 1988. See Nunez-Soto v. Alvarado, 956 F.2d 1, 3 (1st 

Cir. 1992). Moreover, if a plaintiff succeeds in the trial court

but the judgment she obtains is reversed on appeal, she is no

longer entitled to a fee award. See Globe Newspaper Co. v. 

Beacon Hill Arch. Comm'n, 100 F.3d 175, 195 (1st Cir. 1996). 

Applying these standards to the case at bar, it is

evident that the matter of attorneys' fees must be rethought.

Because the plaintiff prevailed below on claims against all three

defendants, none of them opposed her application for fees. In

their appeals, however, they preserved the issue of whether (and

38

to what extent) the fee award could withstand the reversal on

appeal of all or some part of the judgments. This precaution

serves the City in good stead; because the judgment against it

must be reversed, see supra Part V, the fee award against it must 

be nullified.

This leaves a nagging question as to the status of the

award vis- -vis Roderick and Bogan. On the one hand, the

judgments against those two defendants remain intact, see supra 

Part VI, and, thus, as to them, the plaintiff remains a

prevailing party presumptively entitled to reasonable attorneys'

fees. On the other hand, the record before us is opaque as to

the proper extent of that entitlement. This opacity is

particularly pronounced because we do not know how much (if any)

of the work performed by the plaintiff's lawyer in respect to

Scott-Harris' unsuccessful claims against the City paved the way

for her successful claims against the individual defendants.

This is an important datum because a court may allow fees for

time spent on unsuccessful claims only if those claims are

sufficiently linked to successful claims. See Lipsett v. Blanco, 

975 F.2d 934, 940-41 (1st Cir. 1992); Aubin v. Fudala, 782 F.2d 

287, 290-92 (1st Cir. 1986).

We need go no further. From what we have said to this

juncture, it is apparent that the matter of fees must be more

fully explored and it is preferable for obvious reasons that

the trial court, as opposed to this court, undertake what amounts

to an archeological dig into counsel's time sheets and make the

39

necessary factual determinations. We therefore vacate the fee

award against the City and remand so that the district court can

reconsider the amount of fees and costs that should properly be

assessed against the remaining defendants.

The plaintiff also has prevailed on appeal against two

of the defendants, and she is entitled to a reasonable counsel

fee for the work that yielded this victory. Though we often

entertain such fee applications directly, we have sometimes opted

to have the district court handle them. See, e.g., Rodi v. 

Ventetuolo, 941 F.2d 22, 31 (1st Cir. 1991); see also 1st Cir. 

Loc. R. 39.2 (permitting use of this alternative). Because the

district court must in any event reopen its inquiry into the

overall question of fees, we deem it expedient for the plaintiff

to file her application for fees on appeal with that court, and

for that court to make the supplementary award. We leave to

Judge Saris the procedure to be followed on remand in respect to

both reexamination of the original award and initial

consideration of the supplementary award for services rendered

and expenses (apart from ordinary costs) incurred on appeal.

The plaintiff's cross-appeal (No. 95-2100) is denied The plaintiff's cross-appeal (No. 95-2100) is denied 

and the district court's order permitting the reopening of the and the district court's order permitting the reopening of the 

appeal period is affirmed. The judgment against the City of Fall appeal period is affirmed. The judgment against the City of Fall 

River is reversed, and the fee award against it is vacated. The River is reversed, and the fee award against it is vacated. The 

judgments against the remaining defendants are affirmed and the judgments against the remaining defendants are affirmed and the 

case is remanded to the district court for further proceedings in case is remanded to the district court for further proceedings in 

40

respect to both the previous fee award against these defendants respect to both the previous fee award against these defendants 

and the question of fees on appeal. No costs are awarded in Nos. and the question of fees on appeal. No costs are awarded in Nos. 

95-1950 and 95-2100; costs are awarded to the plaintiff in Nos. 95-1950 and 95-2100; costs are awarded to the plaintiff in Nos. 

95-1951 and 95-1952. 95-1951 and 95-1952. 

41